JESSE S. FINLAYSON, SBN 179443
jfinlayson@fwtrl.com
LORI G. GINEX, SBN 223954
lginex-orinion@fwtrl.com
FINLAYSON WILLIAMS TOFFER
ROOSEVELT & LILLY LLP
15615 Alton Parkway, Suite 250
Irvine, CA 92618
Telephone: (949) 759-3810 / Facsimile: (949) 759-3812

PATRICIA R. YOUNG *(admitted pro hac vice)*
pyoung@pylaw.net
PERRONE & YOUNG
109 Westpark Drive, Suite 330
Brentwood, TN 37027
Telephone: (615) 373-6910 / Facsimile: (615) 373-8716

T. LARRY EDMONDSON *(admitted pro hac vice)*
larryedmondson@live.com
LAW OFFICES OF T. LARRY EDMONDSON
800 Broadway, Third Floor
Nashville, TN 37203-3835
Telephone: (615) 254-3765 / Facsimile: (615) 254-2072

*Attorneys for Plaintiffs Wendy Haig; Greg Sadler; and
Showcase 81, LLC*

UNITED STATES BANKRUPTCY COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

LOS ANGELES DIVISION

| | |
|---|---|
| In re | Bankruptcy No. 2:10-bk-29973-BR |
| JOHN SHART and ELKE GORDON-SCHARDT, | Chapter 7 |
| Debtors. | Adv. Proc. No. 2:10-ap-02555-BR |
| WENDY HAIG, GREG SADLER, and SHOWCASE 81, LLC, | **DECLARATION OF PLAINTIFFS' WITNESS WENDY A. HAIG** |
| Plaintiffs, | **Trial/Evidentiary Hearing:** |
| vs. | Date:     April 25, 2012 |
| | Time:     10:00 a.m. |
| JOHN SHART and ELKE GORDON-SCHARDT, | Place:     Courtroom 1668 |
| | 255 E. Temple Street |
| Defendants. | Los Angeles, CA 90012 |
| | Judge:    Hon. Barry Russell |

**Foundation**

1.      I am one of the plaintiffs in the above-referenced adversary proceeding.  I submit this Declaration in support of my claims against Debtors John "Hans" Shart ("Hans") and Elke Gordon Schardt ("Elke," and together with Hans, the "Debtors").  Unless stated otherwise, I have personal knowledge of the facts stated herein and, if called as a witness, I could and would testify accurately and competently thereto.

**General Background**

2.      I am married to Greg Sadler, and we have six children together.  Our children were raised in Santa Fe, New Mexico where my husband and I maintain our primary residence.  Greg and I met in college, where we were both accounting students.  Both of us have degrees in accounting, and after graduation, we both became certified public accountants.  I handle the family's business with the aid of professional help, as necessary.

3.      In approximately 1993, Greg and I discovered that we and our children shared a common love of horses.  We bought several Arabian horses and began to ride and show horses.  All six children were involved with our horses and enjoyed competing in equestrian events.  We were successful with the Arabians in local and area competitions, and as the children grew up, their love of horses continued despite the older children going away to school and pursuing their individual goals.

4.      The horses were always a pleasure, but also a considerable investment of both time and money.  Over time, as our riding skills increased and the children matured, horses and ponies were bought and sold.  Because our ponies and horses had been successful in competition, we were able to sell many ponies and horses over the years, which helped offset the expense of buying new horses.  We learned that in addition to our own riding abilities, the quality and ability of the horses was equally important.

**1999**

5.      As a member at Las Campanas in Santa Fe – a full-service, up-scale resort community – I decided to become involved in the new Las Campanas Equestrian Center ("Las Campanas").  Around 1999, we moved some of our horses to Las Campanas from our home stables.

6.      The Director of the Equestrian Center at Las Campanas, Caroline Stevenson, was well established in the Hunter/Jumper world, so we became acquainted with horses that were Hunters and Jumpers.  My children and I prospered at Las Campanas, and we all showed horses and did very well competitively.  At times, all six children and I were showing at the same horse shows in different classes. The horses were our life, and we participated with the children's dad, Greg, supporting our activities, helping us all, and transporting our horses to the shows.

**2001-2003**

7.      From 2001 through 2003, we were operating out of four barn locations – our home barn, Las Campanas, Santa Fe Horse Park, and a barn operated by Katrin Silva in Raton, New Mexico. It soon became clear to me that life was getting too complicated and involved too much driving for the children.

8.      During our time at Las Campanas, working through its director, Ms. Stevenson, I purchased several high quality horses.  Ms. Stevenson purchased horses from many sources including Hans Shart.  I did not know Hans, but relied on the representation of Ms. Stevenson, and eventually Hans himself, that he was a well-known importer of top quality German Sport Horses.

9.      Through Ms. Stevenson, I bought about five horses from Hans in 2002 and 2003.  In 2002, I paid approximately $107,000 to Hans or Malibu Equestrian Estate, Inc. ("MEE"), Hans' corporation, for two horses (plus he took one of my horses in trade as a partial payment).  In 2003, I paid approximately $180,000 to Hans or MEE for three horses (plus he took two of my horses in trade as partial payment).

10.      These purchases were expensive, but successful, as two of the horses won many ribbons and championships, such as Hakulei and Richie.

11.      In December 2003, I purchased an equestrian facility at 81 Ranch Road in Lamy, New Mexico, which was located about four miles from our home on Vaquero Road.  I hired a trainer and moved all my horses there.  We brought in a few boarders to fill the 26-stall barn (friends of the children and family) and create some revenue.  The atmosphere was wonderful, the children were actively involved, and our family had a great experience involving each and every one of us, including Greg, who did not ride but maintained and improved the facilities while supporting us at shows.

2

Together with my children, we competed and enjoyed our horses.  The children's success led to riding in higher and more competitive levels at the shows.

**2004**

12.    In 2004, I continued to buy horses from Hans and relied on him more with regard to my horse purchases.  In 2004, I paid approximately $121,200 to Hans or MEE for two horses, one of which I did not end up receiving until 2005.

**2005**

13.    In 2005, Kenny Laymon, whom I had known for many years, became the trainer at our facility on Ranch Road.  After I consolidated our horses to the Ranch Road location, I began direct discussions with Hans about purchasing more horses from Germany, as the children had progressed up through the Hunter/Jumper levels at shows, and I now had nice facilities to accommodate more horses.

14.    In 2005, I paid over $450,000 to purchase about seven horses from Hans or MEE, two of which I did not receive until 2006 (Rodney and Larom).  With respect to one of the seven horses, Pico Bello, per my contract with Hans, I owned only forty percent (40%) interest, with Hans owning the rest.  This was far more horses than I had previously purchased from or through Hans in any given year.

15.    Prior to May 2005, I did not board any horses at the Debtors' farm, Greystone Equestrian Center ("Greystone").  From May 2005 through December 2005, only Pico Bello was boarded there.

16.    Prior to 2006, I occasionally saw and briefly interacted with Hans at horse shows (where he sometimes delivered my horses).  Towards the end of 2005 or the beginning of 2006, I visited Greystone for the first time.

17.    In 2005, I wired a total of $485,000 to Hans.

18.    In 2005, I set up Showcase 81, LLC, a limited liability company formed in New Mexico ("Showcase 81"), to hold title to our horses and reduce our liability for such horses, which had previously been titled in my children's names.

### Early 2006

19.    In late 2005, Hans offered me the opportunity to purchase 12 young horses from Germany as an investment for a total price of $360,000 – about $30,000 for each.  Hans told me that these horses were being sold for substantially below market prices.

20.    His idea was that we would select some of the group of 12 for my family and then to resell the remaining horses to offset the purchase and transportation cost for all 12.  He estimated that the sales price of each horse was $45,000 to $60,000 in the United States.  I had never before purchased a group of horses with no specific knowledge about their ages, breeding, abilities, training, or suitability for myself or our children.  But Hans told me what an excellent opportunity and value this purchase would be and that, if we did not act quickly, the horses would certainly be sold to someone else.  In light of his strong history of choosing appropriate horses for my family, I relied on his advice.

21.    After we had agreed on the plan and shortly before I was to make my purchase, Hans told me I would only get 11 horses for my $360,000 because one of the horses I would receive was higher in value than the others.  Despite my concern over receiving less than the number of horses previously promised, I proceeded with payment on the strength of Hans' recommendation.  I believed it would be a good investment, given that the market for sport horses was very strong in 2006, and Hans made it clear that my family could select the horses we wanted and offset the expense by letting Hans sell the horses we did not want for ourselves.  A true and correct copy of the relevant page of my Smith Barney account statement showing my January 12, 2006 wire transfer to Hans in the amount of $360,000 was previously identified on Plaintiffs' Exhibit List as **Exhibit 9** and is attached to this Declaration as **Exhibit A**.  A true and correct copy of the relevant page of my Smith Barney account statement showing my January 20, 2006 wire transfer to Hans in the amount of $65,000 for the transport of the group of horses was previously identified on Plaintiffs' Exhibit List as **Exhibit 10** and is attached to this Declaration at **Exhibit B**.

22.    As far as I am aware, 9 of the 11 horses I had been promised arrived at Greystone in January.  Six of those horses were shipped almost immediately to my barn in New Mexico.  I received some of the younger hunters in New Mexico since my trainer, Mr. Laymon, was very

capable of riding and training "green" horses.  Three horses remained at Greystone.  So from about January 2006 through May 2006, I had 3.4 horses boarded at Greystone (these three and Pico Bello, in which I held a 40% ownership).

23.    Over the next year or so, I repeatedly asked Hans about the missing horses from the group of 12 (which had become the group of 11).  During multiple discussions with Hans, he refused to provide me with an exact list of the names of the horses I had purchased and the accompanying documentation.  When I would visit Greystone, he would just point around to all of the horses there and tell me not to worry because they were mine.  Then, much later, in the second half of 2008, when I finally received an accounting from Hans, Hans claimed for the first time that the "deal" was not for 11 horses.  When he provided the accounting and related list of horses I purchased, he listed only eight horses related to this group.  Significantly, he failed to list Blackie (a/k/a First Class) who was part of this group and who he sold for me in mid-2006 (which would have been the ninth horse I knew of).

24.    When I followed up with him on this accounting and wanted to know the identity of the other two horses I had purchased in early 2006 in this group, he came up with one more horse, Obelix (this became the tenth horse in the group).  After identifying this horse as one of mine, Hans back-billed me for over two years' worth of "Board, etc." fees for Obelix – totaling $67,163 – in an amended July 2008 bill (which I received in August or September 2008).  Obelix had never been ridden or tried by myself or my family, and as far as I am aware, he was never shown at any horse shows.  It was only after we were able to pick up Obelix from Greystone in March 2009 that we discovered Obelix was extremely dangerous to ride.  The vet that came to check him out for me stated that she knew several people who had been injured by Obelix.  Sadly, Obelix died about a month later.  In a pasture, he nicked an artery when he ran into a tree and had to be put down before he bled to death.

25.    I never discovered the identity of or received the eleventh horse in this group.

### **Mid-2006**

26.    By mid-2006, I had become a frequent guest at Greystone, along with some of my children, and I was getting to know Hans and his operation more.

27.     In May 2006, Hans sold Blackie (a/k/a First Class), one of the group of 12 horses, for me for $55,000.  At that time, Hans quickly showed me vet and farrier bills in the amount of $15,000 to $20,000 for my horses at Greystone, and said he would keep such bills in his office for me.  He then told me that the balance of the monies received from the sale of Blackie – approximately $35,000 would be applied to future expenses for the horses.  Up to this point and during this time, Hans did not discuss with me any "boarding" expense related to my family's horses that were kept at Greystone.  And apart from the $15,000 to $20,000 referenced, he did not indicate that I owed him anything more at this time.  Instead, I understood that I had a credit at that point.

28.     In mid-2006, Hans traded one horse on the farm to me, Larom, to make up for about $100,000 of the funds I had advanced to Hans by this point, and I purchased the full interest in Pico Bello (buying out Hans' 60% interest in him).

29.     Around this time and continuing in 2006, Hans also asked me for additional loans/advances of about $250,000.  At the time, he told me he had some work he wanted to do at Greystone and that he could quickly pay me back within a few months based on the proceeds from selling his house in California.

30.     In addition, about mid-summer 2006, Hans contacted me to say that he had located six "fabulous" Grand Prix horses, which had to be removed from Germany immediately.  Hans told me they were incredibly cheap at a cost of about $50,000 to $70,000 per horse and that they could be resold easily in the United States for $100,000 to $150,000 each.  Hans told me very specific stories about why the horses were being sold for below market prices, including that one horse belonged to a family that was "splitting up" and selling the horse at "fire sale" prices.  Based on Hans' representations, I agreed to buy the group of 6 for $265,000 total and wired the funds in late June 2006.  True and correct copies of the relevant pages of my Smith Barney account statement showing my June 30, 2006 wire transfers to Hans totaling $265,000 were previously identified on Plaintiffs' Exhibit List as **Exhibits 15-16** and are attached together to this Declaration as **Exhibit C**.

31.     After I paid for the group of 6, Hans told me that my money had not covered the purchase of all six horses and that he had invested $150,000 of his own money in the group of 6.  Based on this claim, Hans told me that I would only end up owning three of the original group of 6

horses.  However, Hans told me that he had found three additional horses that would be appropriate

for my family and a good investment and convinced me to pay an additional $175,000 in mid-July to

purchase these three horses (thereby restoring the group of 6).  A true and correct copy of the relevant

page of my Smith Barney account statement showing my July 19, 2006 wire transfer to Hans totaling

$175,000 was previously identified on Plaintiffs' Exhibit List as **Exhibit 17** and is attached to this

Declaration as **Exhibit D**.

32.     Hans' changing story regarding the group of 6 made me somewhat uncomfortable.

But Hans assured me repeatedly that I had received a great deal, that he had all of the horses'

passports and shipping records, and that he could confirm the backgrounds and purchase prices of the

horses.

33.     Hans told me that the group of 6 horses I had purchased would be arriving in

Tennessee on August 6 or 7, 2006.  Shortly thereafter, I went to Greystone.  I was accompanied by

Sharn Wordley, a Grand Prix rider I had recently become acquainted with (he had held a private

riding clinic in Santa Fe for me in June 2006), his girlfriend, Mr. Laymon (my Santa Fe trainer), and

my children.  While at Greystone, Mr. Wordley and Mr. Laymon rode about 10 of my horses.  Hans

became visibly agitated that I was having two riders I trusted ride and evaluate the horses he had sold

to me.  Hans told me (before and during the visit) that Mr. Wordley had a very bad reputation, and he

did not want Mr. Wordley involved in any of my horse dealings, nor did he want him to return to

Greystone.  Hans also repeatedly disparaged Mr. Laymon, in part because Mr. Laymon is gay.

34.     Later, after my guests were gone, Hans told me that Mr. Wordley and Mr. Laymon

had upset and embarrassed his ex-daughter-in-law, Beate Kuska Shart.  Beate was Hans' rider, and

she lived at Greystone and was the primary rider/trainer for horses he bought.  Hans claimed while

driving back to Greystone with Beate one evening from a restaurant, the men made inappropriate

sexual comments, including inappropriate comments about my son, Sandy.  Hans further told me that

I had "no idea" what my own people were saying about me.  Naturally, I was upset about this.  When

I spoke with Mr. Laymon, he told me what had been discussed and denied what Hans had said.  I

believed Mr. Laymon, as I knew him very well and it did not seem like something he would do.  I did

not know Mr. Wordley very well, though, so I was not sure how to process Hans' comments about him.  The whole situation made me uncomfortable.

35.    Before we all left Greystone, Hans asked Mr. Laymon which of the group of 6 horses he wanted shipped to New Mexico.  Mr. Laymon made a list for me to give to Hans prior to our departure.  At some point later, Hans gave me reasons why the listed horses were not suitable for Mr. Laymon in New Mexico.  I never ended up having any of these horses sent to New Mexico.

36.    As with the group of 12 horses, I eventually discovered, well into 2008, that I had never received all six horses, but rather, only three horses were attributed by Hans to my purchase at this time.  As before, when we had visited, he indicated that the many horses at Greystone were mine.  At the time of our visit, I believed the horses Champagne, Pina Colada, and Cincinnati were all part of my group of 6 purchase.  In fact, in roughly late 2006 or early 2007, Hans and Beate told to me that my daughter Bryn was coming along in her riding and would soon be able to ride Pina Colada, so I thought the horse was ours.  They also asked me questions about showing Cincinnati in 2007, including whether it was ok with me to use a certain rider to show Cincinnati, so again, I though the horse was ours at the time.  Hans claimed in 2008 that these three horses were not mine, and I actually re-purchased Cincinnati at that time because, as Hans continued to insist, Cincinnati was a great investment and I was sure to get my money back and much more since he had buyers lined up – though that never happened.

37.    Based on my sale of Blackie and my receipt/purchase of Larom, a full interest in Pico Bello, and the group of 6 horses (of which I only actually received three), I had no more than seven horses boarded at Greystone from June 2006 through February 2007 (notably, the three group of 6 horses did not arrive until about August 2006).

38.    Up to this point, I had not really intended to leave any of my horses with Hans in Tennessee and expected that all of them would be shipped to me in New Mexico at some point if they were not sold.  Because of that, I never spoke with Hans about any boarding expense for these horses. I expected that I would pay vet and farrier related charges, but I did not know whether Hans was charging me for boarding or how much.  Regardless, Hans never told me I owed him anything for boarding costs at this time.

8

**Late 2006**

39.    In fall 2006, one of my daughters, Soleil, attended school in Germany.  When I spoke to Hans prior to my daughter leaving about where she would live while in Germany, Hans insisted that she live with his niece, Gabriella Kroop, who spoke fluent English and apparently lived near Soleil's school.  He proposed that I build out the basement in Ms. Kroop's property for Soleil.  When I arrived in Germany with Soleil to set up her living situation, I realized that Ms. Kroop lived too far away from Soleil's school (about 20 minutes by car), and so I set Soleil up in a student apartment in Heidelberg.  Soleil still spent a good deal of time with Ms. Kroop's family in their home since she dated Ms. Kroop's son and often tutored him with his school work.  Ms. Kroop raved about Soleil to me, and I was happy Soleil was able to spend time with her family while in Germany.  Also, Ms. Kroop co-signed for Soleil on her German bank account and got her a cell phone since Soleil was under 18 and not a resident of Germany, which were both requirements for obtaining a bank account and cell phone.

40.    Early in the fall of 2006, Hans sent Beate to visit us in New Mexico for four or five days at our facility to see how the "green" horses from the group of 12 were progressing in their training under Mr. Laymon.  Beate spent several days with my trainers, Mr. Laymon and a woman who rode for me, Randi Lorber.

41.    In the midst of Beate's visit, Hans called to say that he needed her to return to Tennessee right away to show horses to buyers from a foreign country who were coming to Greystone.  She left earlier than she was scheduled to leave my facility.

42.    Following Beate's visit, I heard nothing but complaints and negative comments from Hans about both Mr. Laymon and Ms. Lorber.  Because I continued to trust his opinion, I asked Hans to find me a trainer in New Mexico of whom he approved.  He never did.  Instead, Hans said he wanted me to bring my two youngest children, Bryn and Sandy, to Tennessee for training and that he wanted to start training and showing some of my horses boarded at Greystone.  As I mentioned, I had never planned on keeping the horses I had purchased in 2006 in Tennessee, but Hans criticized my trainers and said he could handle the horses and, with Beate riding and training my children, maximize the potential of both my family and the horses.  So I ended up keeping seven of the horses I

9

had purchased from him that year in Tennessee with Hans and Beate.  Again, Hans did not talk with me about boarding and training related expenses for the horses at this time.

43.    Beginning in September 2006, I began commuting on weekends with Bryn and Sandy to attend horse shows with my Tennessee-based horses and around this time, Hans and Beate began coaching my children at shows.  During the fall of 2006, we attended three horse shows in Franklin, Tennessee, Knoxville, Tennessee, and St. Louis, Missouri.  The children continued to attend school in Santa Fe, while traveling back and forth to Tennessee and the show grounds.

44.    Hans was very kind to our family during this time.  He provided guest accommodations for us at Greystone, lent us horses to try at shows and, generally, seemed to take a great interest in the children and their riding skills.  The children made progress training with Hans and Beate and were enjoying riding.

45.    I did not attend the third show in St. Louis because it was extremely cold.  Instead, I sent Ms. Lorber to take care of the children as they were staying in our travel trailer at the show.  Hans continued to complain to me about Mr. Laymon and Ms. Lorber at every opportunity.

46.    Also, at some time in 2006, Hans told me that he had received a message from Ms. Stevenson (the Director of the Equestrian Center at Las Campanas) and Mary Amelia Howell (a member of Las Campanas) concerning a horse transaction.  Hans said that he had recorded a 30 to 40 minute conversation, which Ms. Stevenson and Ms. Howell had about me without realizing they had not turned off their speaker telephone.  Hans said the conversation was very disparaging and critical of me.  Since I was at Greystone one or two days later, I asked if I could listen to the message, and Hans told me that he had erased it by mistake.

47.    Throughout 2006, Hans continued to undermine my faith in the horse professionals and employees around me.  He never once found anything positive about my facility in New Mexico and made me feel that I could not maximize the potential of my children and horses.

48.    By late 2006, Hans began to convince me that he could do much more for my family and my horses at Greystone in Tennessee than myself and my staff were able to do in New Mexico.  He often spoke with me about moving my entire horse operation to Greystone in Tennessee.  He said we could live in his guest rooms on weekends.  At the time, I did not think this was a workable idea.

49.    In 2006, in addition to the $865,000 I sent to Hans related to the group of 12 and group of 6 purchases, I sent Hans $854,000 related to the full purchase of Pico Bello, horse care fees, show fees, and requested advances, for a total of $1,719,000 in 2006 alone.  In light of my advances in prior years, my credit for the sale of Blackie, and the significant amount of money I paid Hans in 2006, I was certain that I had a huge credit with him.  However, to that point, I had not received any bills from Hans, so I was not sure how much he had charged me for anything apart from the horse purchases, and even the funds expended for horse purchases/transport were sometimes a little murky.

50.    So that there would not be any confusion moving forward, I sent Hans a letter on about November 22, 2006 (on the same day I wired him an additional $150,000), to which I attached a list of payments I knew I had made to Hans/MEE between May 2005 and September 2006.  This was not meant to be a complete list, as it was difficult for me to go through all of my accounts on-line and to make sure I had not left off any.  I believed there were likely wires I was missing from 2005, but I wanted to get to Hans what I could.  I was not concerned about providing every last wire to Hans at this time since Hans told me again and again that he kept meticulous records of all of this information.  In my November 22, 2006 letter, I requested Hans' help in identifying the purpose of each payment (horse purchase, horse boarding/care, or advance) and noted that the total amount of money I advanced to Hans as of that date was "definitely … more than $250,000.00."  At the time, I believed that my advances to Hans could have easily exceeded $450,000, as shown on the notes attached to my letter.  A true and correct copy of my handwritten letter to Hans with the handwritten attachment thereto was previously identified on Plaintiffs' Exhibit List as **Exhibit 179** and is attached to this Declaration as **Exhibit E**.

51.    Hans never responded directly to my letter.  Whenever I tried to discuss money and billing issues with him, he always seemed to have a good reason not to address them right then with me.  He would act a little bumbling and confused and would tell me that he would look at the issue more closely when he got back to the office.

### Early 2007

52.     At this point I had about 20 horses at my 81 Ranch Road facility in New Mexico. Hans convinced me to send most or all my horses to the February 2007 Gulfport, Mississippi horse show for five weeks, so that he could help me evaluate and sell some of them.

53.     Sometime before the show, Hans told me that his motor home had mechanical problems and that he needed a replacement one in which to stay while at horse shows. I agreed to purchase two motor homes for horse show use, enabling everyone to stay on the show grounds during shows – one for use by my family and one for Hans to use.

54.     In or around January 2007, I wired funds to the vendor for two motor homes. The motor home that was purchased for my family's use cost $245,495 (the "Haig Motor Home"), and the motor home purchased for Hans to use cost $240,973 (the "Disputed Motor Home"). I relied on Hans to handle the necessary paperwork, but I expressly and repeatedly instructed Hans to title both motor homes in my name. A true and correct copy of relevant page of my Smith Barney account statement showing my wire transfer on January 24, 2007, in the amount of $100,000, and on February 2, 2007, in the amount of $386,468, for payment to a dealership for two Allegro motor homes, the Haig Motor Home and the Disputed Motor Home, was previously identified on Plaintiffs' Exhibit List as **Exhibit 180** and is attached to this Declaration as **Exhibit F**.

55.     Prior to making the $240,973 payment to purchase the Disputed Motor Home, I was apparently provided with a copy of the Purchase Agreement for that vehicle which identified the buyer as "John Shart" – although I do not recall noticing Hans' name on the document at that time. I did not deem it necessary to review the documentation in detail before making the payment since I trusted Hans to follow my instructions regarding titling both motor homes in my name. I had no reason to think Hans would steal from me.

56.     It was not until very late in 2008 or early 2009 that I learned that Hans had registered the Disputed Motor Home in his name against my specific instructions. Prior to that, in roughly mid-2007, Hans had told me that he was going to insure the Disputed Motor Home as part of his fleet policy, but I did not assume this meant he had or would title the Disputed Motor Home in his name and he never told me as much. I thought he was just getting a better deal on insurance, which I would

inevitably pay him for, as I sent him large sums of money throughout 2007 and beyond.  In fall 2007, Hans admitted to me that he had not yet registered the vehicle because he, with the help of Elke, was shopping around for the cheapest state sales tax he could get.  At no point in time in 2007 and up through the latter part of 2008 did Hans tell me that he was not or had not titled the Disputed Motor Home in my name and at no point during this time did he claim it was a "gift" to him.

57.   In February 2007, I sent 18 to 20 horses, Ms. Lorber, and one of my grooms, Miguel, to the Gulfport, Mississippi horse show.  The kids and I flew back and forth between Santa Fe and Gulfport so the children could continue to attend school.  My daughters, Soleil and Sky, also came to Gulfport to ride and show some of the horses.  There were 24 horses at Gulfport, and I was charged for all the show costs even though I had provided two employees and Hans had three or four of his own horses at the show.  When I asked Hans about the show bills, he would always tell me that he would make an accounting at a later time – once back at his home office.  He also told me that he kept daily expense records at shows.

58.   Before and during the Gulfport show, Hans continued to try to convince me to move my entire horse operation to Tennessee and, specifically, talked to me about returning with all my horses to Tennessee instead of New Mexico.  He again tried to convince me that my children and the family's horses would be better off training at Greystone.  He said that he could rent portable stalls for my horses while we were building a pole barn with stalls for my horses, which he said would cost about $45,000.  We also agreed upon a flat fee of $50,000 per month for the board and feeding of all of my horses, including routine veterinary and farrier charges regardless of the number of horses there in any given month.  If the numbers were to go up or down a few horses, the monthly fee was agreed to stay the same.

59.   I told Hans I was not willing to move my family's horses to Greystone, in large part because it made no sense to board all of our horses more than 1,000 miles from our home.  In response, Hans offered to have the children live with him, to which I said "no."  I told him that would be uncomfortable.

60.   Hans then came up with the plan that would allow me to have a personal residence and my own barn located at Greystone.  Specifically, Hans suggested that I could pay him to construct a

private apartment and barn at Greystone that would belong to me and my family.  He assured me there was plenty of room at Greystone for such a structure.

61.     During the Gulfport show, I finally relented to Hans' relentless pressure.  I agreed to move my horses to Greystone and to build the apartment and barn structure at Greystone that would belong to my family – not that Hans would build a barn and let us use it for a charge or otherwise.  In retrospect, I realize I should have consulted an attorney regarding the details, but Hans was very persuasive and went out of his way to make me feel comfortable about the whole arrangement.

62.     Hans did some drawings for me on pieces of paper showing how we could organize an apartment above a 12-stall barn.  He said the 12-stall barn and a simple apartment above it would cost about $45,000.  Hans said he had built his own barn and renovated the property's existing barn when he bought Greystone, and that he could build my apartment and barn without any problem.  I trusted him.  Construction started immediately, and Hans began traveling back and forth from Mississippi to Tennessee during the five-week Gulfport show so that he could work on my apartment and barn.

63.     Rather than taking my horses back to Santa Fe after the Gulfport Show, all of those horses returned to Tennessee in March 2007.  The horses were originally stabled in portable stalls in a hay barn on the Greystone property.  Over the next several months, most of my family's horses in Santa Fe were moved to Greystone.  From approximately March 2007 to December 2008, my family boarded up to 26 horses at Greystone, with approximately 20 to 25 of our horses being boarded there in any given month.  During this time, we were essentially the only "boarders" at Greystone.

64.     Per my agreement with Hans, I believed Hans was charging me a "flat fee" for horse boarding and training of $50,000 per month, including routine veterinary and farrier charges.  Additionally, I had agreed to reimburse Hans/Greystone for third-party horse show bills incurred in attending horse shows – if advanced for me by Hans.  That is to say, I would reimburse Hans for: (a) fees he paid at the end of each show to the show operators, such as entry fees (each horse incurs fees to be on the show ground and participate in the event), class fees for each class entered, stall rentals, bedding, and trailer hook up fees (for staying in our own motor homes, which were not provided by Hans); and (b) fuel for transport (and since we were using my Peterbilt truck to pull all of the horses (his and mine), I would not have paid mileage fees).  From the outset, Hans clearly

14

promised that my family would not be charged any fees by Greystone or MEE for attending horse shows with him – specifically, he would not charge me "day care fees" (essentially, taking care of the horses at the show, including body clipping and braiding) and "schooling fees" (essentially, training the horses while at the show).  Despite my requests, I did not receive any bills from Hans, Greystone or MEE in 2007, and as noted, I had not received any prior to this time.

65.    Back at Greystone, the apartment and barn construction project expanded far beyond what Hans had showed me in his basic plans.  Hans more than doubled the size of what we discussed in terms of the barn's footprint and poured a huge concrete slab and concrete pillars without my knowledge.  When I next visited Greystone in spring 2007 and saw the footprint with the roof completed, I was shocked to see the largest barn I have ever seen in my life.  Hans said that the additional area was going to be a large garage.  It looked to me like such a "garage" could hold four large 55-passenger buses, as well as other vehicles.  When I expressed my surprise and concern to Hans, who was managing the entire project, he told me not to worry about anything.  Regardless, by that time, the concrete was poured and there was nothing I could do.  I figured at the time that I would have to invest about $200,000 into what had become this larger project.  After this point, however, Hans continued to do this same thing over and over again – surprise me with major additions to my barn and apartment that we did not discuss beforehand.

**Mid-2007**

66.    Also in spring 2007, shortly after construction of my family's apartment and barn began, Hans brought to my attention that there was a contiguous 19-acre parcel of land owned by the neighboring Flowers family, which might be for sale on the north side of the Greystone property.  Hans told me he thought he could get the land for a good price, that it would be valuable as additional pasture land for my horses, and that it would be a very good investment for me because he could negotiate the price close to $4,000 an acre when it was really worth about $5,000 an acre.  Based on Hans' assurances, I agreed to pay $80,000 for the land.

67.    Although Hans and I walked the Flowers property several times and discussed it at length – including changing the drainage of the land and other methods of maximizing the pasture it would provide – Hans said we would have to be careful with regard to my purchase of the property

because he did not think the Flowers would sell their property to a "stranger."  Hans thought it would be best for him to buy the Flowers property and then transfer it to me several months after he closed the purchase.  Hans was very persuasive and so I agreed to allow him to purchase the Flowers property in his name and then to transfer title to me after the closing.

68.     In May 2007, Hans had me wire $85,000 to his account as he anticipated approximately $5,000 in closing costs in addition to the purchase price.  A true and correct copy of the relevant page of my Smith Barney account statement showing my wire transfer to Hans on May 8, 2007, in the amount of $85,000 was previously identified on Plaintiffs' Exhibit List as **Exhibit 34** and is attached to this Declaration as **Exhibit G**.

69.     Hans closed the sale and promised to transfer the Flowers property into my name as soon as a little time went by.  When I later tried to have Hans transfer the title to my name, he always made up stories and excuses.  For example, I would try at times to make appointments with him and attorneys so that the title could be transferred, and he would always make an excuse for why it was not a good time for him.  This type of thing went on for months and months.  Hans never ended up transferring title to me as promised.

70.     In addition to my $85,000 Flowers property payment, from March 2007 through July 2007, I sent Hans large sums of money for construction of the apartment and barn, boarding and training fees, and advances on future bills when Hans asked me to do so.  Leading up to and during this time, I did not receive any bills from Hans, construction, horse related, or otherwise.  He would occasionally tell me generally the costs of specific items related to the construction, and I would send him funds to cover those costs.  In total, from March through July 2007, I sent Hans $1,021,000.

71.     I also paid third-parties directly for some purchases related to the construction and fixtures.  For example, in April through June 2007, I made payments for flooring, appliances and other items to Home Depot (for flooring in the amount of $11,131.77), AllBright and LockWood (for bathroom fixtures in the amount of $606.69), Sagustu (a company in Germany from whom Hans ordered rubber tile for my barn floors in the amount of $13,354.50), and Story and Lee (for appliances in the amount of $7,415.99) for a total of $32,508.95.  True and correct copies of the relevant invoices and checks and relevant pages of my Bank of America and Smith Barney account

statements showing that the invoices were paid were previously identified on Plaintiffs' Exhibit List as **Exhibits 167-175** and are attached together to this Declaration as **Exhibit H**.

72.     I know I made other construction related expenditures to third parties as well, but I do not have documentation handy regarding these additional expenditures.  For example, during the summer, I brought a friend, Tommy Moylin, an expert at installing tile, to Greystone from Santa Fe to finish tile work in my apartment.  He did tile work for about one month.  However, Hans made his life miserable, and he had to return to Santa Fe.  For his work, I paid him over $7,000.

73.     In addition to construction related costs paid directly to Hans and third parties, I paid for the furnishings, linens, etc. for all 5 apartments.  During June or July 2007, I traveled to Tennessee accompanied by Holly Ambrose, an Interior Designer from Santa Fe, who was helping me furnish the apartments.  Elke accompanied Ms. Ambrose and me on the shopping trip for furnishings for the five apartments.  At no time during this visit or the shopping trip did I hear Elke object to or express any reservations about the construction of the Haig Barn.

74.     With regard to furnishings, in August 2007, I paid $2,890 to Flatrock, $853 to City Tabletop, $5,672.12 to Restoration Hardware, at least $2,039.01 to WM Supercenter, $950.17 to Bed Bath & Beyond, and $529.46 to Linensource, for a total of $12,933.76  True and correct copies of the relevant pages of my Smith Barney and Bank of America statements showing these payments were made were previously identified on Plaintiffs' Exhibit List as **Exhibits 176-177** and are attached together to this Declaration as **Exhibit I**.

75.     I know I made other decorating related expenditures as well, including paying Ms. Ambrose for her services, but I do not have documentation regarding these additional expenditures.

76.     The end result of the construction project was a 12-stall barn, commercial laundry room, huge garage (large enough to house two custom coaches or a motor home and tractor trailer), my four bedroom/four and one-half bath apartment, plus four additional one bedroom apartments for grooms (because Hans felt like I needed to have a place for my employees, though he personally kept running them off).  The project was completed in July 2007, and we moved in.  From the start of the

project until December 2008, when Hans kicked me off of the property, Hans always referred to the apartments and barn as mine and told me we could stay there "forever."

77.    My family also attended many horse shows with Hans throughout the summer of 2007.

78.    As September approached, I decided to allow my daughter Bryn to remain at Greystone and enroll in online home schooling for the 2007-2008 academic year. My son Sandy did not want to do this, so he returned to school in Santa Fe in August, but he went back and forth to Greystone throughout the fall on weekends and for horse shows.

79.    Around August or September 2007, I informed Hans I was bringing my Interior Designer, Ms. Ambrose, back to Tennessee for about three days to finish up some unfinished items in my apartment. Hans said Ms. Ambrose was not to come to Greystone because she was a pain in the neck and Beate did not want her there. I, therefore, asked her not to come.

80.    Also around September 2007, Hans told me that his health issues prevented him from driving the truck which he frequently used to transport our horses to shows. I knew that even prior to this time, Hans had asked my husband Greg to drive the truck in his place. However, Hans' truck had a manual transmission, which Greg's commercial driver's license did not permit him to drive. Because this was a continuing problem that seemed to be getting worse, I agreed to purchase a Kenworth truck with an automatic transmission for Hans' and Greg's use.

81.    On September 13-14, 2007, I wired $162,250.43 to the dealership for the purchase of a 2008 Kenworth truck, VIN No. 1XKWDB9X28J228697 (the "2008 Kenworth Truck"). Again, I relied on Hans to handle the necessary paperwork and expressly instructed him to title the Kenworth in my husband's name. A true and correct copy of the relevant page of my Smith Barney account statement showing my wire transfer on September 13, 2007, in the amount of $80,000, and on September 14, 2007, in the amount of $82,250.43, to Murphy-Hoffman Company for the purchase of the Kenworth Truck was previously identified on Plaintiffs' Exhibit List as **Exhibit 183** and is attached to this Declaration as **Exhibit J**.

82.    Pursuant to our agreement, Hans picked up the 2008 Kenworth Truck. Well after I purchased the 2008 Kenworth Truck, again very late in 2008 or early in 2009, I learned that Hans had

18

titled it in his own name or in the name of MEE instead of under my husband's name.  Even after this point, however, Hans reassured me that he understood this truck belonged to me.  In fact, he asked me during that late 2008 early 2009 time period when I was going to come to Greystone to pick up the truck.  As an aside, Hans rarely used the truck; instead, he used other vehicles I had brought to Greystone.

**Late 2007**

83.    Because the apartments and barn were completed in July 2007, I expected Hans to stop asking me for money related to construction.  However, throughout the fall of 2007 and even into the spring of 2008, Hans continued to inexplicably demand more and more money from me for construction, along with more money for the care of my horses.  This is when I truly feel he started bullying me, and he would occasionally yell at me if I questioned him.  Generally, he would call me and demand enormous lump sum payments, arguing he could not finish construction and care for my horses without such further funds.  I would try to get specifics from him over the phone or in person, and he would sometimes provide me with numbers, but no documentation.  I would write down what I could in an effort to keep track of things, but the information I received was very spotty.  As an example, a true and correct copy of a post-it note I handwrote in October 2007 noting that Hans had spoken with me about making my $50,000 monthly payment for care of the horses and that he was also insisting on $7,200 for barn doors was previously identified on Plaintiffs' Exhibit List as **Exhibit 178** and is attached to this Declaration as **Exhibit K**.  In general, Hans made me feel like I had no choice but to send him more money or risk having incomplete projects on my barn and apartments and the care of my many horses at Greystone.  Regardless, I expected that I would get the reconciliation I had been asking for at some point and that I would be able to use credits in the future.

84.    Apart from demanding more money and yelling at me at times, Hans seemed to be trying more and more to control and intimidate me.  For example, after we moved into my apartment at Greystone, I asked on multiple occasions to have locks put on my doors.  No matter how much I asked Hans or one of the workers on the property, locks were never installed.  With free access, Hans would often just appear in my apartment.  I found him sitting in my living room more than once when

1   I would come out of my bedroom or the bathroom.  It made me very uncomfortable, but I was not

2   sure how to deal with it.

3        85.     Throughout fall 2007, I noticed Hans was doing construction work on all his other

4   buildings.  I began to become suspicious that Hans was using my funds to support other construction

5   for his own buildings on the property while explaining to me that more money was needed for what I

6   believed were extravagances to my apartments and barn.

7        86.     For example, after my friend who had helped with our tile work left the property, Hans

8   hired a German friend of his to complete the tiling and then proceeded to tile all the walls in my barn

9   as well as all the decks on both sides of the second floor of my building.  I complained about the

10  extravagance, but Hans moved forward with the work anyway.  Suspiciously, at the same time, I

11  noticed tile being installed throughout the other two horse barns and on the large deck of his own

12  apartment at Greystone.

13       87.     During this time there was also discussion about the style and cost of the two story

14  garage doors and the railings on the extensive balconies surrounding the second-story apartments.  I

15  insisted on the less expensive garage doors and refused to have the railings made of milled wood

16  installed, choosing the permanent plastic ones instead.  Again, I noted the same kind of plastic

17  railings being installed in other buildings at Greystone.

18       88.     When I visited Greystone, I felt like I was seeing other supplies I had purchased going

19  into other buildings at Greystone or just disappearing, such as the rubber tiles used in my barn and

20  window blinds I had purchased.

21       89.     In general, in fall 2007, Hans seemed to just want to keep charging me for finishing

22  work on my apartments and barn in the form of extravagances I just did not feel we needed.  I asked

23  him to just stop spending money on my apartments/barn on several occasions, but he did not listen.

24  For example, on one visit in fall 2007, I noticed he was installing all kinds of stone work on the lower

25  exterior of the building.  I told him I did not want stonework, but it made no difference.  Around this

26  time, he also decided to install a second story inside of the garage for storage and a stairway leading

27  up to it, and he also insulated the whole garage and installed a heating system in it.  Again, I did not

28  want any of these additions and told him so.  It was frustrating because he would always seem to start

some new project without my approval, and once it was started, it was difficult for me to get him to stop or refuse to pay since it was my apartments and barn.

90.     Towards the end of 2007, I became more and more frustrated that Hans kept requiring me to send him more money, while at the same time failing to provide me with supporting documentation, such as bills, cost summaries, and horse-related paperwork.  Nothing was ever provided to me.  Like he always had done, Hans would come up with a good story and excuse as to why the documentation was not available.  For example, I know he had a bookkeeper throughout 2007, and he would often say that he would have the bookkeeper look into my questions, acting like he did not know the answers himself.  Then, he fired the bookkeeper towards the end of 2007, which also became an excuse for him to wait to provide supporting documentation to me.

91.     Towards the end of 2007, I hand wrote another list of wires that covered the period of 2005 through 2007 (except for some or all of December 2007 wires, since I wrote the list in early December 2007).  I gave this handwritten list to Hans at the time.  Again, I went through my accounts on the Internet and tried to get him as many as the wires as I could, but he should have had all of this information in his own records regardless.

92.     In 2007, I sent Hans a total of $1,702,200.  Certainly, I was sure that I had paid him significantly more than the $50,000 per month in horse boarding, training, vet, and farrier costs I had agreed to pay from March 2007 forward, the cost of my apartments and barn, and any show fees from 2007.  So by this time, I became even more insistent that Hans provide me with a reconciliation of all of my expenses and payments and the total of my credits.

## Early 2008

93.     In January 2008, I purchased another horse from Hans, Alf, for $111,075.  Hans had me wire the purchase price to a bank account in his name at Volksbank Triberg EG, in Triberg, Germany.  In my experience, a horse can be shipped from Europe in about a week.  Alf did not arrive until March 2008, after I had asked Hans about the delay many times.  The way he arrived was strange.  The woman who delivered Alf to the Gulfport show had said she had been riding him for a while in New England.  I had no idea why she would have been riding the horse before I received him.

94.      In early 2008, Hans insisted that we had to take our horses to the long Gulfport horse show again with him.  When I told him that I could not afford the expense, he asked me how much I was willing to spend.  I told him very clearly that my absolute maximum was $50,000.  He said he could stay within that budget and assured me that he would pay the difference if he exceeded $50,000.  Based on Hans' assurances, we agreed to take some of our horses to the show.  Later, in fall 2008, Hans insisted that I pay him an additional $18,000 plus for this show, the amount by which he exceeded the budget.  He insisted on this despite the fact that he made a promise to me and regardless of the fact that I am sure he did not split the total show bill properly to take in consideration the horses he owned, which also attended the show.

95.      In addition to consistently demanding bills, I also continually asked for documentation regarding my horse purchases from Hans, as I wanted to confirm my family's ownership of the many horses at Greystone that I believed were ours.  Hans' story on which ones were ours seemed to change by the day, so it was important for me to finally pin him down, especially because I knew that all of the horses that I owned were not registered to Showcase 81 or my family.  In about February 2008, Hans prepared and we both signed an Agreement and Acknowledgement of Ownership, which referenced horses that Hans admitted were my family's horses currently boarded at Greystone.  Hans acknowledged in the Agreement that the listed horses might still be registered in the name of MEE but that I was the owner and could register the horses in my name at any time.  A true and correct copy of the signed Agreement and Acknowledgement of Ownership was previously identified on Plaintiffs' Exhibit List as **Exhibit 185** and is attached to this Declaration as **Exhibit L**.

**Mid-2008**

96.      In May 2008, I also entered into an agreement with Hans to purchase a 50% interest in another horse, Cincinnati.  This was the last horse I purchased from Hans (I purchased the remaining 50% of Cincinnati in 2009 after the Tennessee litigation had begun).

97.      During 2008, Hans bought a lot of equipment and did a great deal of landscaping at Greystone, always while telling me he was desperate for cash.  Many times, I told him not to spend what he did not have, and he always said there would not be a problem because we were going to sell

Cincinnati to the German Equestrian Team for $500,000, which would result in a nice profit for us both.  That never happened.

98.    My family and Hans attended a horse show in Tunica, Mississippi in June 2008.  After the Tunica show, I told Hans that I would not attend more horse shows because of the severe decline in the stock market and the large show expenses.  In response, Hans became visibly frustrated and tried to pressure me into attending future shows – even though I advised him again and again that I could not afford it.

99.    My daughter Bryn continued to live at Greystone riding and training her horses.  My son Sandy also spent one month at Greystone working for Hans as a laborer.  I visited on a weekly basis as usual.  But during this time, my trust in Hans decreased.  I insisted more and more that I needed billing documentation for everything.  That being said, Hans kept bullying me for more money all the time, claiming that my failure to pay would place my family's horses at risk or jeopardize my children's ability to participate in various horse shows or other riding activities. Because I felt I had no other choice, I continued to send money every month.

100.    Eventually, Hans hired a new accountant, Susan Rhea, in about mid-2008.  I had several discussions with her over the next months regarding billing issues.  She told me that Greystone's record keeping was essentially nonexistent and the records that did exist were "a big mess."  Specifically, Ms. Rhea indicated that Greystone's bank statements had not been reconciled for over six months.

101.    Then, on about July 10, 2008, I received an overnight package from Elke in California (not Hans) which contained a one-page document entitled "Accounting for Wendy Haig 2205-2007 [sic]" (the "2005-2007 Accounting") and a two-page document entitled "Wendy Haig's Horse Purchases," which purported to summarize all of the horses purchases my family made through or from MEE during the time period of 2005 through 2007, including the prices paid.  In the 2005-2007 Accounting, Hans and Elke acknowledged receipt of $3,698,000 from me during that three-year period.  However, they also claimed that my charges during that same time period totaled $3,942,793.47 and that I still owed them an additional $244,793.47.

23

102.    Virtually nothing in the 2005-2007 Accounting seemed right to me, and I immediately objected to the accounting to Hans.  Specifically, I pointed out numerous errors and inconsistencies in the accounting and that it contained literally no detail or support.  A true and correct copy of the 2005-2007 Accounting with my handwritten notes from the time period, which indicate that I thought nearly every number contained therein was wrong, was previously identified on Plaintiffs' Exhibit List as **Exhibit 187** and is attached to this Declaration as **Exhibit M**.

103.    One of the problems with the 2005-2007 Accounting was that it substantially understated the amount of my payments during the relevant time period.  In fact, I actually paid Hans/MEE $3,991,200 between 2005 and 2007, which is $293,200 more than the amount shown in the accounting.  In addition, the 2005-2007 Accounting failed to provide any credit for my family's horses that were sold during that time period, such as Blackie in 2006 or Legitimate Cool in 2007.

104.    The 2005-2007 Accounting also included enormous "block" charges that were completely unsubstantiated and made no sense.  For example, the 2005-2007 Accounting included $854,511.26 in unsubstantiated "Construction Costs" – without any details or back-up whatsoever.  This amount was substantially more than I had ever agreed to pay for construction of my apartments and barn and much more than seemed reasonably possible.  Seeing that high number actually confirmed my fears that Hans had tricked me into paying for various construction and repairs at Greystone unrelated to my apartments and barn.

105.    The 2005-2007 Accounting also included "Board/Training" in the amount of $876,500 – which also appeared impossibly high under the circumstances.  As explained above, I did not move the vast majority of my family's horses to Greystone until after the Gulfport show in February/March 2007, and we then boarded between 20 and 25 horses at Greystone in any given month from March 2007 to December 2007.

106.    The 2005-2007 Accounting also included items I had simply never agreed to pay, including vet and farrier charges separate and apart from the "Board/Training" charges.  Again, my agreement with Hans was that all routine vet and farrier charges would be included in my $50,000 per month flat fee rate.

107.    There were so many problems with the 2005-2007 Accounting that it caused me to have more questions and concerns than ever before.  I simply could not believe that, under any circumstances, I owed Hans any money.  I was incredibly upset that despite all of the money I had sent him over the years, including advances as he requested them, he was now claiming that I owed him nearly $250,000 based on a one-page summary "accounting" that was wrong in so many ways.  Needless to say, the 2005-2007 Accounting resulted in many arguments between me and Hans, extreme threatening and bullying by Hans, and a categorical refusal by Hans to produce any kind of documentation or details.

108.    In July 2008, I also received a detailed monthly billing statement for the first six months of 2008 from Ms. Rhea/Hans, and thereafter, I received additional monthly billing statements for 2008.  The 2008 billing statements required corrections, which were made – with argument and difficulty – ending in a final summary accounting dated January 5, 2009, which is discussed below.  True and correct copies of the final versions of the monthly bills I received in 2008 and early 2009 were previously identified on Plaintiffs' Exhibit List as **Exhibit 188** and are attached to this Declaration as **Exhibit N**.

109.    In the end, the charges for 2008 seemed mostly correct, except for all the horse show charges, the missing credits included in my January 2009 faxes to Hans, the strange addition of the horse Obelix to my bills, and the separate charges for boarding and training and vet and farrier costs (as opposed to the $50,000 flat fee that had been agreed upon).

110.    On July 25, 2008, Hans wired money to me ($5,000) for the first and only time.  A true and correct copy of the relevant page of my Smith Barney account statement showing Hans' wire transfer to me on July 25, 2008, in the amount of $5,000 was previously identified on Plaintiffs' Exhibit List as **Exhibit 84** and is attached to this Declaration as **Exhibit O**.  Hans sent me this money after I demanded that he begin to pay me back on advancements I had made to him.  Beginning in about mid-2007, Hans had told me to pay $45,000 instead of $50,000 some months so that the advancements I had provided would begin to be paid down.  At this point, there was still so much owed by Hans to me – despite what was listed in his incorrect 2005-2008 Accounting – that I told him in July 2008 that he simply had to start paying me back.  This payment was the first and only

payment Hans ever made to me (as opposed to allowing me to take a credit with regard to a horse or the agreed-upon monthly horse charge).

111.    On about August 18, 2008, I entered into a written agreement with Hans in which Hans agreed to act as our "agent in the showing, potential sale, and sale" of my family's horses stabled at Greystone (the "Agency Agreement").  That day, I was going to head to Switzerland with my son Sandy for a couple of weeks to get him started at school there.  This was the first time he was going to boarding school.  Before Hans would drive me to the airport for my flight out of town, Hans demanded that I sign the Agency Agreement so that he could pursue finding buyers for some of my horses.  I told him that it was not necessary, as I would certainly be available by phone if Hans needed my approval for a potential sale.  Regardless, Hans said he would literally not take me to the airport unless I signed the Agreement, so I did.  A true and correct copy of the signed August 18, 2008 Agreement was previously identified on Plaintiffs' Exhibit List as **Exhibit 189** and is attached to this Declaration as **Exhibit P**.

### Late 2008

112.    In fall 2008, Hans insisted that my daughter Bryn go to the Franklin, Knoxville, and Atlanta horse shows.  Due to market conditions, I told Hans that I could not pay for the shows and we would not be attending.  He said that Bryn and Beate had worked hard, and it was important for them to attend the shows, so he said he would pay for the shows.  I felt like there was no stopping him from going with my horses, and he went to the Atlanta shows with them when I was in Europe and I did not even realize it was happening.  My 2008 billing statement shows a total charge of $49,210.98 for these three shows.  Hans has refused to take this charge off my bill saying that Bryn and my horses attended and, therefore, I should pay.

113.    On September 24, 2008, a 100+ acre farm located five miles away from Greystone on Campbellsville Pike was being auctioned for sale by the owners.  Hans insisted I come to the auction because it was a great deal and an opportunity to make some money.  Following the auction, when I was to make my payment to hold the property until closing, Hans presented me with all the paperwork and told me to sign.  When I looked at the paperwork, the contract was not in my name; rather, it was in Hans' name, which is apparently how Hans had dictated the papers be drafted by the

auctioneer.  Fortunately, I refused to sign and had all the paperwork started fresh in my name.

During the 30-day period between the purchase and the closing, Hans called me about five or six

times to try to convince me to sign a Deed placing the farm in his name.  At the closing, the Auction

Company representative asked me where Hans was because Hans had told him that he (Hans) was

one of the purchasers of the property.  I closed on the property 30 days after the auction with all

documents in my name.  I then listed the property through an agent secured by Hans and, much to my

amazement; the agent thought the land was owned by Hans.

114.    For the remainder of 2008, I continued to demand an accurate accounting of my wires

and charges, especially with regard to the 2005 through 2007 time period.  In response, Hans

threatened and bullied me and continued to demand yet more money and information from me.

Among other things, Hans threatened to sell my horses to pay the amounts he was demanding.

115.    Hans and Elke also continuously asked me to provide them with more information

regarding all of the money I had sent them, and at the same time, they refused to provide me any

more information regarding what I believed were improper charges.  During this time, I did not want

to send them an exact total of my wires since their bank statements would contain this information

(even if their accounting records did not), but more importantly, I was afraid that if I gave them an

exact total, they would just generate a summary bill with more improper charges and claim that I

owed more than that total.

116.    So instead of sending this information to them, in about October 2008, I offered to

send my business person, John Sharp, to Greystone to go over the wires and charges with them in

detail.  Hans went into a rage and flatly refused to meet with Mr. Sharp.

117.    Then, in December 2008, I asked my contact at Smith Barney to send Hans the wire

transfer detail from my account there via fax.  I told him the fax would be coming.  The woman at

Smith Barney told me that she tried for hours to send the fax, but it would not go through since Hans'

fax machine was turned off.  I truly do not believe that he and Elke ever really wanted all of the wire

detail for any legitimate purpose.

118.    By December 2008, I just wanted to be done with Hans and our dispute.  I was scared

and intimidated by him, and I was so tired of feeling bullied and taken advantage of.  I wanted to end

all ties with Hans.  So on December 4, 2008, in an attempt to resolve our dispute, I wrote a two-page letter to Hans "relinquishing" title to all horses at Greystone, except the horse Cincinnati, on the condition that Hans transfer the Flowers Property and all of my personal property including the Kenworth truck and the Allegro to me.  Hans told me for weeks afterwards that he was thinking about the offer in my letter, but he never affirmatively responded to the letter.

119.    On about December 18, 2008, Hans sold my horses Fox and Smiley without my consent.  At the time Fox and Smiley were sold, I was present at Greystone and physically and verbally objected to their removal from the property.  But Hans told me that I had no say in the matter and that he was selling the horses.  He even refused to give me the last names of the two people who removed the horses, advising me that I could not interfere with "his business."

120.    Immediately after this incident, I instructed my lawyer, Ralph H. Scheuer, to contact Hans with the hope of resolving our dispute.  Mr. Scheuer's December 19, 2008 letter touched on various open issues with regard to my relationship with Hans, including the Agency Agreement.  A true and correct copy of Mr. Scheuer's December 19, 2008 letter to Hans was previously identified on Plaintiffs' Exhibit List as **Exhibit 193** and is attached to this Declaration as **Exhibit Q**.

121.    After receiving the letter, Hans again became irate and forced me to get my lawyer to withdraw the letter.  This was another instance where Hans was driving me (and Bryn) to the airport in Tennessee and refused to take me until I submitted to his intimidation tactics.  I was trying to get home for Christmas, which was only a few days away, and I had to make my flight, so I contacted my lawyer and he sent Hans a fax withdrawing his prior letter.  But none of this changed the fact that I did not want Hans selling my horses and I told him so, and it did not change the fact that we had multiple outstanding issues that needed to be resolved.

122.    On December 26, 2008, I sent another letter to Hans pointing out various errors, omissions, and inaccuracies on the 2008 billings.  I tried desperately to strike a cordial tone in my letter, as I truly wanted to resolve this ongoing dispute once and for all.  A true and correct copy of my December 26, 2008 letter to Hans was previously identified on Plaintiffs' Exhibit List as **Exhibit 195** and is attached to this Declaration as **Exhibit R**.

123.    In 2008, I sent Hans a total of $1,079,371.35.

124.     From 2005 through 2008 inclusive, I had sent Hans a total of $4,985,371.35 (not counting the $85,000 I had sent Hans to purchase the Flowers property for me).  I reviewed the Declaration of John Shart, filed with the Court on March 21, 2010, in preparation of this Declaration. Therein, he admits to having received all of my wires to him that comprise this amount except for the following seven wires.  These seven wires are supported by the documents attached hereto as **Exhibit S**, which are true and correct copies of the relevant pages from my Smith Barney account and which were previously identified on Plaintiffs' Exhibit List by the numbers in parenthesis:  (1) a May 20, 2005 wire in the amount of $100,000 (**Plaintiffs' Exhibit 2**); (2) an April 26, 2007 wire in the amount of $11,000 (**Plaintiffs' Exhibit 32**); (3) a December 20, 2007 wire in the amount of $50,000 (**Plaintiffs' Exhibit 59**); (4) a January 14, 2008 wire in the amount of $111,075 (**Plaintiffs' Exhibit 61**); (5) an April 11, 2008 check in the amount of $2,800 (**Plaintiffs' Exhibit 73**); (6) an August 14, 2008 check in the amount of $2,520.15 (**Plaintiffs' Exhibit 86**); and (7) a September 15, 2008 wire in the amount of $44,000 (**Plaintiffs' Exhibit 88**).

125.     Also, Hans had sold multiple horses of mine during that time, including at least the following horses, which I believe were sold at the time noted in parenthesis:  Blackie (May 2006); Fox (December 2008); General (August 2008); Smiley (December 2008); Legitimate Cool (a/k/a Legs) (December 2007); Merci Beaucoup (October 2006); Prosekko (September 2008); and Richie Ramiro (December 2007).

**Early 2009**

126.     In January 2009, Hans continued to bully me into sending him more money and threatened to send my family's horses to the slaughterhouse or to sell them if I did not pay him what he was demanding.

127.     In early January 2009, I received a January 2009 bill from Hans.  A true and correct copy of the January 2009 bill I received was previously identified on Plaintiffs' Exhibit List as **Exhibit 196** and is attached to this Declaration as **Exhibit T**.

128.     On about January 2, 2009, Hans sent me a response to my December 26, 2008 letter, in which he conceded that an August 15, 2008 wire in the amount of $25,000 had not been properly credited to my account.  He otherwise disputed the claims in my letter.  A true and correct copy of

Hans' January 2, 2009 letter to me was previously identified on Plaintiffs' Exhibit List as **Exhibit 197** and is attached to this Declaration as **Exhibit U**.

129.    On about January 4, 2009, Hans sent me another letter regarding our billing dispute. A true and correct copy of Hans' January 4, 2009 letter to me was previously identified on Plaintiffs' Exhibit List as **Exhibit 198** and is attached to this Declaration as **Exhibit V**.

130.    On about January 5, 2009, I received a three-page document entitled "Wendy Haig Accounting" (the "2008 Accounting"). The 2008 Accounting was a summary of the 2008 billings and in that document Hans acknowledged receipt of an additional $942,002.56 in cash payments from me during 2008. It also credited me for $164,000 in horse sales, $19,126 for my purchase of a scissor lift, $15,500 for my purchase of a washer and dryer, and $25,000 for the previously missing August 25, 2008 wire. In total, the 2008 Accounting reflects $1,165,628.56 in payments and credits that year. Despite these significant payments and credits, Hans somehow continued to maintain that I owed them more money, due in part to additional construction costs, apparently incurred months after my apartments and barn were completed, and commissions related to horse sales, which Hans had said he would not charge me. Based on these documents, Hans claimed I owed him $195,036.48 as of December 31, 2008. A true and correct copy of the 2008 Accounting that I received on or about January 5, 2008, was previously identified as **Plaintiffs' Exhibit 199** and is attached to this Declaration as **Exhibit W**.

131.    In late December 2008 and early January 2009, I made a real effort to continue to try to resolve some of the disputed issues in the recent accountings. For example, on about January 5, 2009, I sent Hans a fax regarding the payment I made for the purchase of Alf in the amount of $111,075, which was not represented on his accountings. A true and correct copy of my January 5, 2009 fax to Hans was previously identified on Plaintiffs' Exhibit List as **Exhibit 200** and is attached to this Declaration as **Exhibit X**.

132.    On about January 6, 2009, I sent Hans another fax regarding the sale of Legitimate Cool (a/k/a Legs) and the credit owed to me for that sale. A true and correct copy of my January 6, 2009 fax to Hans was previously identified on Plaintiffs' Exhibit List as **Exhibit 201** and is attached to this Declaration as **Exhibit Y**.

133.    That same day, Hans sent me another letter and made it clear that he would not comply with my reasonable requests for him to fix the accountings and that he would also not give me information regarding the individual to whom he sold my horses in December 2008 because that was only his "business."  A true and correct copy of Hans' January 6, 2009 letter to me was previously identified on Plaintiffs' Exhibit List as **Exhibit 202** and is attached to this Declaration as **Exhibit Z**.

134.    In his January 2, 2009 and January 6, 2009 letters to me, Hans insisted that effective January 2009, I must pay in advance for board and pay vet and farrier bills directly, all despite the fact that I believed he owed me significant sums of money and even though he admitted I was owed other credits.  Hans constantly called to demand money telling me he did not have money to feed my horses.  I told Hans that he need not worry, since I would have my horses out of Greystone by the end of January.  On January 5, 2009, I wired $10,000 to Hans to insure my horses would at least be fed until I could get them away from Greystone.

135.    Ultimately on January 8, 2009, when I refused to pay the full amount Hans demanded, Hans evicted my family from Greystone and refused to allow me to get my horses and other property.  Specifically, after receiving Hans' last letter, I went to Greystone with Greg, my daughter Soleil, and Mr. Sharp on about January 7-9, 2009, to pick up my horses, which Hans had told me to do a few days before, claiming he could not afford to keep them.  Once we got there, Hans demanded a further payment of $200,000 by me prior to releasing the horses.  I remember him acting like I was lucky this was all he was demanding at this point.  He specifically told me that Elke had told him to demand $250,000.  I continued to deny that I owed any additional amounts to Hans and refused to pay.  At that point, we pleaded with Hans to at least allow us to take the five horses that were Bryn's personal horses, but he would not allow it.  Bryn was 14 at the time and had been riding these horses six days a week since she got them.  But Hans refused to release any of my family's horses and other property – including Bryn's horses – and demanded that we leave Greystone.

136.    On about February 6, 2009, Greg, Showcase 81, and I filed a lawsuit against Hans, Elke, and MEE in the Tennessee Chancery Court, Case No. 4394 (the "Tennessee Lawsuit").

137.     On March 2, 2009, the Tennessee Chancery Court entered an Agreed Temporary Injunction prohibiting the Hans, Elke and MEE from selling any additional horses or other personal I owned (including the Kenworth Truck).  The Agreed Temporary Injunction stated that the following eight horses "ha[d] been sold and [were] no longer in the possession and control of [Hans, Elke and MEE]:  Alf, Avion, Catskill, Ivan, Loriot, Magnum, Pooh, and Romeo."  I am informed and believe and thereon allege that these horses were excluded from the Agreed Temporary Injunction due to information provided by the Defendants in the Tennessee Lawsuit, as it was not provided on our end. A true and correct copy of the Agreed Temporary Injunction was previously identified on Plaintiffs' Exhibit List as **Exhibit 215** and is attached to this Declaration as **Exhibit AA**.

138.     In March 2009, I placed "Please Help Find" advertisements in several horse industry publications, including *Chronicle of the Horse*, requesting assistance in locating my family's horses that we believed had been sold by Hans in January 2009.  True and correct copies of samples of the "Please Help Find" advertisements were previously identified on Plaintiffs' Exhibit List as **Exhibit 214** and are attached together to this Declaration as **Exhibit BB**.

139.     On about March 5, 2009, my representatives went to Greystone to remove my family's remaining horses and personal property.  I am informed and believe from my discussions with them that Elke was present at Greystone.  At that time, my representatives were permitted to retrieve the following 11 horses belonging to my family:  Bombay, Charlie, Darcy, Gringo, Handsome, Lady, Lord, Obelix, Pico Bello, Rodney, and Urmel.  They were not allowed to retrieve various items of my family's personal property including:  the Disputed Motor Home; the 2008 Kenworth Truck; an expensive area rug that had been in my son Sandy's bedroom in my apartment that was worth approximately $5,000 to $7,000 and was missing when my representatives arrived; the washer and dryer and other appliances in the apartments; lighting and bathroom fixtures; some of our tack; and the Equissage.

140.     Over the months that followed, I found myself embroiled in expensive litigation with Hans and Elke, and I had to fight hard to get back a few more of my remaining horses and to get any further information from Hans and Elke regarding my property.  On about May 18, 2009, my representatives obtained possession of Catskills and Cincinnati.  As part of that transaction, I paid Gretchen

Anderson $2,503 as reimbursement for veterinary pre-purchase exam expenses incurred by her in connection with Ms. Anderson's possible purchase of Catskills from Hans.  On about September 3, 2009, I purchased Ivan and Magnum back from Annette Delaplaine, a third-party Hans had sold them to in January 2009, for $20,000 total.  On about September 9, 2009, I repurchased Alf from Brian Powell, a third party Hans had sold him to in mid-2009, for $50,000.  My family has never recovered the following seven horses:  Avion; Fox; Larom; Loriot; Peu a Peu (a/k/a Pooh); Romeo; and Smiley.

### Final Comments

141.    Throughout my life I have had to rely on others due to a very busy schedule.  I have always been fortunate that the trust I placed in people was not violated – until I met Hans.  In the beginning, Hans was always a gentleman and offered to do anything he could to help me and my children.  He gained my confidence and worked to alienate me from others close to me in the horse world that I trusted.  I let him take care of my equestrian related activities more and more as time progressed.  With regard to the significant payments I made to him, I trusted Hans when he told me that he had detailed documentation and would provide me with a full reconciliation of the amounts he charged and the amounts I paid.  By late 2007, it became apparent that I needed to review bills and documentation for charges that seemed to me totally out of line with my agreement with Hans – both as to the horses and the construction – and make sure Hans had properly credited me for all I the funds I had sent him and for horses he had sold for me.  My insistence on getting this information from Hans – information he claimed he had all along and promised he would provide – was the downfall of our relationship.

142.    As noted above, I have six children, all of whom have been active in sports, the arts, and music, and have been successful in their studies.  My life was devoted to my children and all their activities.  During this same period of involvement with Hans, I had three children in schools/colleges in Europe and needed to make many trips to look at schools as well as visit the children.

143.    In addition, I had elderly parents living in New Jersey who died in 2004 and 2005.  I was extremely preoccupied with my care for them in New Jersey over their last years, especially my

90 year old father after my mother died. Following their deaths, there was much to be taken care of. I did not, at that time, have any office assistance to handle my investments and properties.

144.    In November 2007, I hired my first assistant to help plan and organize my daughter Tracy's wedding. Following the December 15, 2007 wedding, my brother was gravely ill, and I spent many weeks in Denver caring for him.

145.    Basically, Hans stepped in at just the right time to help me and always said he would take care of whatever was needed. I relied on him and trusted him when he told me had taken care of various matters such as registration of vehicles, land title, and all the horse transactions.

146.    I now realize that Hans set out to take financial advantage of me by gaining my confidence and then creating so many stories that I could never really follow what was happening. Once I began to challenge him and refused to continue to be his "cash cow," he turned on me, intimidated me, and bullied me into continuing to do things his way. I ended up feeling trapped in a very difficult situation, and despite my attempts to fix things, it all just seemed to get worse and worse in late 2008.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 8th day of February 2012, at Ocala, Florida.

_____
WENDY A. HAIG

**NOTE:** When using this form to indicate service of a proposed order, **DO NOT** list any person or entity in Category I. Proposed orders do not generate an NEF because only orders that have been entered are placed on the CM/ECF docket.

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is:
**15615 Alton Parkway, Suite 250, Irvine, CA 92618**

A true and correct copy of the foregoing document described as **DECLARATION OF PLAINTIFFS' WITNESS WENDY A. HAIG** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner indicated below:

**I.  TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING ("NEF")**:  Pursuant to controlling General Order(s) and Local Bankruptcy Rule(s) ("LBR"), the foregoing document will be served by the court via NEF and hyperlink to the document.  On **February 8, 2012**, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following person(s) are on the Electronic Mail Notice List to receive NEF transmission at the email address(es) indicated below:

- **Jesse S Finlayson**    jfinlayson@fwtrl.com, wmills@fwtrl.com
- **United States Trustee (LA)**    ustpregion16.la.ecf@usdoj.gov
- **Jason Wallach**    jwallach@gladstonemichel.com

☐  Service information continued on attached page

**II.  SERVED BY U.S. MAIL OR OVERNIGHT MAIL** (indicate method for each person or entity served):  On **February 8, 2012**, I served the following person(s) and/or entity(ies) at the last known address(es) in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States Mail, first class, postage prepaid, and/or with an overnight mail service addressed as follows.  Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

Presiding Judge:
Honorable Barry Russell
United States Bankruptcy Court
255 E. Temple Street, Suite 1660
Los Angeles, CA 90012
[BY OVERNIGHT MAIL]

Counsel for Defendants:
Elke Gordon Schardt
Law Office of Elke Gordon Schardt
44319 Lowtree Avenue
Lancaster, CA 93534
[BY U.S. MAIL]

☐  Service information continued on attached page

**III.  SERVED BY PERSONAL DELIVERY, FACSIMILE TRANSMISSION OR EMAIL** (indicate method for each person or entity served):  Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on **Fill in Date**, I served the following person(s) and/or entity(ies) by personal delivery, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on the judge will be completed no later than 24 hours after the document is filed.

☐  Service information continued on attached page

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

| 2/8/12 | Wendy S. Mills | /s/ Wendy S. Mills |
|---|---|---|
| Date | Type Name | Signature |

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*August 2010*                                                    **F 9013-3.1.PROOF.SERVICE**