JESSE S. FINLAYSON, SBN 179443
jfinlayson@fwtrl.com
LORI G. GINEX, SBN 223954
lginex-orinion@fwtrl.com
FINLAYSON WILLIAMS TOFFER
ROOSEVELT & LILLY LLP
15615 Alton Parkway, Suite 250
Irvine, CA 92618
Telephone: (949) 759-3810 / Facsimile: (949) 759-3812

PATRICIA R. YOUNG *(admitted pro hac vice)*
pyoung@pylaw.net
PERRONE & YOUNG
109 Westpark Drive, Suite 330
Brentwood, TN 37027
Telephone: (615) 373-6910 / Facsimile: (615) 373-8716

T. LARRY EDMONDSON *(admitted pro hac vice)*
larryedmondson@live.com
LAW OFFICES OF T. LARRY EDMONDSON
800 Broadway, Third Floor
Nashville, TN 37203-3835
Telephone: (615) 254-3765 / Facsimile: (615) 254-2072

*Attorneys for Plaintiffs Wendy Haig; Greg Sadler; and Showcase 81, LLC*

UNITED STATES BANKRUPTCY COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

LOS ANGELES DIVISION

| | |
|---|---|
| In re<br><br>JOHN SHART and ELKE GORDON-SCHARDT,<br><br>Debtors. | Bankruptcy No. 2:10-bk-29973-BR<br><br>Chapter 7<br><br>Adv. Proc. No. 2:10-ap-02555-BR |
| WENDY HAIG, GREG SADLER, and SHOWCASE 81, LLC,<br><br>Plaintiffs,<br><br>vs.<br><br>JOHN SHART and ELKE GORDON-SCHARDT,<br><br>Defendants. | **DECLARATION OF PLAINTIFFS' WITNESS JOHN SHARP**<br><br>**Trial/Evidentiary Hearing:**<br>Date:  April 25, 2012<br>Time:  10:00 a.m.<br>Place:  Courtroom 1668<br>           255 E. Temple Street<br>           Los Angeles, CA 90012<br>Judge:  Hon. Barry Russell |

1.    I am an adult citizen and resident of Santa Fe, New Mexico. Unless stated otherwise, I have personal knowledge of the facts stated herein and, if called as a witness, I could and would testify accurately and competently thereto.

2.    I am currently retired. From 1971 through 2003, I worked in the hospitality industry. I have held positions that include director of Human Resources for Hilton Canada and general manager and vice president of operations for Hilton International, where I supervised the construction and opening of hotels, and I have supervised as many as 750 employees. In 2003, I retired from my last position which was vice president and general manager for Las Campanas, an upscale Santa Fe, New Mexico community built on 5,000 acres. Las Campanas offers 1,500 residential lots and is home to two golf courses, equestrian and tennis facilities, a spa and club facilities.

3.    I met Wendy Haig and Greg Sadler socially through my work at Las Campanas. We became friends due in large part to our mutual love of horses. I have owned and been involved with horses for over 60 years.

4.    In October 2008, Wendy hired me to assist her in the management of her affairs and financial records. I received, opened, and sorted faxes, emails, mail and courier deliveries that came into Wendy's office for personal or business matters. When Wendy was at home, we worked side-by-side. When she traveled, we spoke frequently by phone, and she would provide instructions on which I would act. At her direction, I responded to correspondence, performed banking transactions, and assisted Wendy in the management of her own or her rental properties. I was hired to work part time, but by January 2009, I worked full time for Wendy. For health reasons, I left Wendy's employ in August 2010.

5.    Initially, I had little to do with Showcase 81, LLC, the family's limited liability company that owned the hunter and jumper horses the family rode and competed with, except for the day-to-day banking.

6.    In the fall 2008, Wendy told me that she was having trouble getting an accounting from John "Hans" Shart regarding charges for her horses at Hans' facility in Tennessee, and that she believed she had paid significantly more than she owed him. In part, she thought she had been

1

overbilled regarding a barn she constructed at Greystone Equestrian Center for her family (the "Haig Barn").

7. In an effort to resolve the dispute, I offered in fall 2008 to go to Tennessee and sit down with Hans and/or his bookkeeper to reconcile the differences in Wendy's and Hans' accountings. Wendy was relieved, and she told me she would contact Hans and set this up. Wendy later told me that Hans became enraged when she suggested I go to Greystone and meet with his accountant, and that he refused to permit me to come to Greystone, or otherwise discuss his bills with me.

8. By Thanksgiving 2008, Wendy had become upset over the situation with Hans, and she talked to me about her frustration with Hans demanding monies from her that she did not owe.

9. By mid-December 2008, Wendy was extremely upset and depressed that she could not get a full accounting from Hans regarding charges for horses, horse purchases, and the barn she had built at Greystone. She told me that Hans refused to sit down with her and go through the bills with her.

10. Wendy asked me to make an accounting based on bills she had received from Hans and her payments to him using his bills dating back to 2005.

11. By late December 2008, the only bills Wendy had from Hans were:

    a. A summary bill from 2005 – 2007 delivered to Wendy in July 2008, with a page that documents horse purchases and prices. This document was previously identified as **Plaintiffs' Exhibit 187**, at pp. 2-4, and it is being submitted with the Declaration of Plaintiffs' Witness Wendy Haig (the "Haig Declaration").

    b. Monthly bills from January 2008 until July 2008 delivered to Wendy in or around July 2008. These documents were previously identified as **Plaintiffs' Exhibit 188**, at pp. 2-9, and they are being submitted with the Haig Declaration.

    c. Monthly bills delivered to Wendy each month from August, September, October and November 2008. These documents were previously identified as **Plaintiffs' Exhibit 188**, at pp. 10-17, and they are being submitted with the Haig Declaration.

2

12. By early January 2009, Hans had sent Wendy a December 2008 summary bill and a January 2009 monthly bill. These documents were previously identified as **Plaintiffs' Exhibit 199** and **Plaintiffs' Exhibit 196**, and they are being submitted with the Haig Declaration.

13. In December 2008, I researched Wendy's bank and investment accounts for all payments made directly to Hans or his/Malibu Equestrian Estate's regular bank accounts and for all payments made at his direction (for example, to a bank account of Hans' in Germany relative to a horse purchase). I also researched payments for equipment or purchases related to construction of the Haig Barn at Greystone. I then created an accounting.

14. The accounting I completed in late December 2008 showed that Wendy had significantly overpaid Hans by hundreds of thousands of dollars based on the invoices presented by Hans to Wendy as described in paragraph 11. It was impossible to know exactly by how much Wendy had overpaid since Hans had sold or traded some of Wendy's horses without accounting those sales or trades to Wendy and giving her credit for the same.

15. By the end of December 2008, Wendy had determined she would move all of her horses from Greystone because the situation had deteriorated so badly. She told me she felt bullied and intimidated by Hans, that she could not get him to discuss his billings, and that he had told her to take her horses and get off of his property right away.

16. In early January 2009, I helped locate horse trainers in the middle-Tennessee area with room to temporarily stable Wendy's horses until she could move them back to Santa Fe.

17. Wendy asked me to accompany her to Tennessee with her husband, Greg Sadler, and her daughter, Soleil, to help move all their horses out of Greystone Equestrian Center.

18. Apart from helping move the horses, Wendy hoped that I could get Hans to go through the accounting of his bills and Wendy's payments to show him that Wendy was significantly overpaid and that he had failed to credit many payments she had made.

19. On January 7, 2009, I flew to Tennessee with Wendy's family and stayed at their apartment at Greystone. On the morning of Thursday, January 8, 2009, I accompanied Greg Sadler to the barn at approximately 9:00 a.m. to ask Beate Shart, reportedly the daughter-in-law of Hans,

and Daniella, a German woman residing at Greystone, if we could start loading horses. Beate and Daniella told us we had to wait for Hans, who arrived about 20 minutes later.

20. We told Hans we were ready to start loading up the horses and that we would take Bryn's first, as they were going to one destination. Hans said he was not letting the good horses go because Wendy owed him a lot of money. He then said we should talk in the office. Greg and I went with Hans to his office where Hans said: "Greg and I need some time alone to talk man-to-man about your wife [sic]." I left for about 30 minutes and returned to ask if they were finished. I was advised to join them. Hans then discussed the fact that Wendy was having some kind of a breakdown because the money/stock markets were bad, but he needed to have his bills paid. At some point in the discussion, he told us to wait because he had something to show us. He returned with a photo copy of a handwritten letter from Wendy dated December 4, 2008, relinquishing ownership of the horses if Hans would return a list of assets (including land and vehicles) Wendy claimed in the letter that she owned and had paid for.

21. Greg and I each told Hans that we had not seen the letter and asked him what he was going to do about the letter because we had come to Greystone to remove horses at his request. He said not to worry about the letter and explained that what he wanted was the cash owed to him by Wendy. He expressly stated that he did not want the horses. To the best of my recollection, at this point Greg and I left Hans and went out to talk things over. We returned to the apartment to consult with Wendy and then returned to talk with Hans about the money he claimed he was owed – over $200,000.

22. Our discussion with Hans continued. Hans made a lengthy discourse about the bills sent to Wendy and all the work it had taken his wife, Elke Gordon Schardt, to prepare them (somewhere between days to months). I started asking Hans about the various items referenced by Wendy in her December 4, 2008 letter to Hans. I asked Hans whether he would let Wendy have the horses and property items she claimed were hers. He said no. He also said he was owed his full outstanding balance even though I told him I had identified many payments from Wendy that were not included in his accounting. He stated more than once that Wendy did not own the Flowers land, that the truck and bus had been gifts to him, and that he had no intention of returning gifts given to

him just because Wendy was short of money. He further stated that Wendy had given him the gifts in appreciation for all he had done for her family and that Beate Shart was a witness to the gift-giving.

23. I then asked Hans about the significant investment Wendy had made in the Haig Barn, and he said that under Tennessee law, the building was on his property and therefore it was owned by him. I asked Hans if he would compensate Wendy for the value of the building and he said: "No, that is her tough luck." Our meeting ended.

24. Sometime later that afternoon, Greg and I returned to meet with Hans in his office. I showed him an adding machine tape indicating that Wendy had made payments totaling $50,000 more than his bills for the year 2008 and told him I was prepared to go through all of the billings. He became enraged and ordered Greg and me to get out of his office. Hans said he would send Wendy's horses to be slaughtered if she did not pay his bill. Greg was obviously upset. I flatly refused to leave, and told him that I could not help settle the amounts he was claiming were owed to him if he did not take the time to look at what I had and discuss the matter. He calmed down slightly and said: "If there is a credit for 2008, I will apply it against the balance owing from previous years." He still would not go through my register tape showing all of Wendy's payments and compare those to his bills.

25. At about 6:00 p.m. that day, I went alone over to the large garage where there was a birthday supper in progress. Hans came over to talk to me, and he seemed very calm. He again said he did not want to sit down and compare records. He said that his accounting was "perfect" and that it was not up to him to justify his bills but that it was up to Wendy to prove he was wrong. I asked him what it would take to settle this financial situation. He did not give an answer. I asked him if a payment were made of the amount allegedly owed to him, less the $50,000.00 overpayment for 2008, whether everything could be settled and return to business as usual. He said: "No, it is more complicated than that. I think we should let the attorneys work this out. I still have a few good fights left in me."

26. I then asked Hans if he still wanted the horses removed. He said that they could stay, but only if Wendy paid her full board each month, paid the veterinary and farrier bills directly to the vendors, and paid him the back-money she owed him. He refused again to sit down and go through his bills and Wendy's payments.

27. In none of the three discussions I had with Hans on January 8, 2009, did he claim ownership of Wendy's horses based on her December 4, 2008 letter. He did not claim any sort of lien. His only basis for refusing to let us remove the Haig horses was that we wanted to remove the "good ones." After further discussion, he changed his position and said that she could take none of the horses until she paid money he claimed she owed in excess of $200,000.

28. I returned to the apartment, and left Tennessee with the Haig family on Friday, January 9, 2009, without any further contact with Hans.

29. I did not ever receive for Wendy a faxed letter from Hans dated December 6, 2008. I first saw that letter after it was produced in the Tennessee litigation in May 2009, and I was asked by Wendy whether I had received it at work. December 6, 2008, was a Saturday and I did not work over the weekend. On Monday, December 8, 2008, when I came to work, there were no faxes in the machine from the weekend – and I verified this from the machine's fax history.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 6th day of February 2012, at Santa Fe, New Mexico.

_____
JOHN SHARP

Trial Declaration of John Sharp (Final)

6

**NOTE:** When using this form to indicate service of a proposed order, **DO NOT** list any person or entity in Category I. Proposed orders do not generate an NEF because only orders that have been entered are placed on the CM/ECF docket.

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is:
**15615 Alton Parkway, Suite 250, Irvine, CA 92618**

A true and correct copy of the foregoing document described as **DECLARATION OF PLAINTIFFS' WITNESS JOHN SHARP** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner indicated below:

**I. TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING ("NEF")**:  Pursuant to controlling General Order(s) and Local Bankruptcy Rule(s) ("LBR"), the foregoing document will be served by the court via NEF and hyperlink to the document.  On **February 8, 2012**, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following person(s) are on the Electronic Mail Notice List to receive NEF transmission at the email address(es) indicated below:

- **Jesse S Finlayson**    jfinlayson@fwtrl.com, wmills@fwtrl.com
- **United States Trustee (LA)**    ustpregion16.la.ecf@usdoj.gov
- **Jason Wallach**    jwallach@gladstonemichel.com

☐ Service information continued on attached page

**II. SERVED BY U.S. MAIL OR OVERNIGHT MAIL** (indicate method for each person or entity served):  On **February 8, 2012**, I served the following person(s) and/or entity(ies) at the last known address(es) in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States Mail, first class, postage prepaid, and/or with an overnight mail service addressed as follows.  Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

Presiding Judge:
Honorable Barry Russell
United States Bankruptcy Court
255 E. Temple Street, Suite 1660
Los Angeles, CA 90012
[BY OVERNIGHT MAIL]

Counsel for Defendants:
Elke Gordon Schardt
Law Office of Elke Gordon Schardt
44319 Lowtree Avenue
Lancaster, CA 93534
[BY U.S. MAIL]

☐ Service information continued on attached page

**III. SERVED BY PERSONAL DELIVERY, FACSIMILE TRANSMISSION OR EMAIL** (indicate method for each person or entity served):  Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on **Fill in Date**, I served the following person(s) and/or entity(ies) by personal delivery, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on the judge will be completed no later than 24 hours after the document is filed.

☐ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

| 2/8/12 | Wendy S. Mills | */s/ Wendy S. Mills* |
|---|---|---|
| *Date* | *Type Name* | *Signature* |

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

August 2010

**F 9013-3.1.PROOF.SERVICE**