JESSE S. FINLAYSON, SBN 179443
jfinlayson@fwtrl.com
LORI G. GINEX, SBN 223954
lginex-orinion@fwtrl.com
FINLAYSON WILLIAMS TOFFER
ROOSEVELT & LILLY LLP
15615 Alton Parkway, Suite 250
Irvine, CA 92618
Telephone: (949) 759-3810 / Facsimile: (949) 759-3812

PATRICIA R. YOUNG *(admitted pro hac vice)*
pyoung@pylaw.net
PERRONE & YOUNG
109 Westpark Drive, Suite 330
Brentwood, TN 37027
Telephone: (615) 373-6910 / Facsimile: (615) 373-8716

T. LARRY EDMONDSON *(admitted pro hac vice)*
larryedmondson@live.com
LAW OFFICES OF T. LARRY EDMONDSON
800 Broadway, Third Floor
Nashville, TN 37203-3835
Telephone: (615) 254-3765 / Facsimile: (615) 254-2072

*Attorneys for Plaintiffs Wendy Haig; Greg Sadler; and Showcase 81, LLC*

UNITED STATES BANKRUPTCY COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

LOS ANGELES DIVISION

| | |
|---|---|
| In re<br><br>JOHN SHART and ELKE GORDON-SCHARDT,<br><br>    Debtors. | Bankruptcy No. 2:10-bk-29973-BR<br><br>Chapter 7<br><br>Adv. Proc. No. 2:10-ap-02555-BR |
| WENDY HAIG, GREG SADLER, and SHOWCASE 81, LLC,<br><br>    Plaintiffs,<br><br>vs.<br><br>JOHN SHART and ELKE GORDON-SCHARDT,<br><br>    Defendants. | **DECLARATION OF PLAINTIFFS' WITNESS GREG SADLER**<br><br>**Trial/Evidentiary Hearing:**<br>Date:  April 25, 2012<br>Time:  10:00 a.m.<br>Place:  Courtroom 1668<br>            255 E. Temple Street<br>            Los Angeles, CA 90012<br>Judge:  Hon. Barry Russell |

1. I am an adult citizen and resident of Santa Fe, New Mexico. Unless stated otherwise, I have personal knowledge of the facts stated herein and, if called as a witness, I could and would testify accurately and competently thereto.

2. Wendy Haig and I have been married for 28 years, and we have six children together. Our children were raised in Santa Fe, New Mexico, where Wendy and I maintain our primary residence. Wendy and I met in college, where we were both accounting students. Both of us have degrees in accounting, and after graduation, we both became certified public accountants. I retired my CPA license over 20 years ago. Wendy handles the family's business with the aid of professional help, as necessary, and I provide some assistance as she requests.

3. In approximately 1993, we found that we, along with our children, shared a common love of horses. In the years that followed, we bought and began to ride and show horses. All six of our children were involved with our horses and enjoyed competing in equestrian events. The horses were always a pleasure, but they were also a considerable investment of both time and money. Over time, as Wendy's and the children's riding skills increased, and as the children matured, horses and ponies were bought and sold to allow the children to advance their skills. In 2005, Wendy set up Showcase 81, LLC, a limited liability company formed in New Mexico, to hold title to and manage our horses and related activities.

4. I do not ride horses, but I have supported Wendy and the children by attending shows, making or overseeing improvements at our barn here in Santa Fe, and transporting horses from Santa Fe to shows and other facilities. Eventually, I was involved with transporting horses to and from Greystone Equestrian Center, Hans' facility in Tennessee.

5. In late-2006 and early-2007, we began to attend horse shows where we would stable near Hans, who also had horses at the same shows. We had a friendly relationship with Hans, and he took an interest in our children at those shows.

6. In early 2007, at the Gulfport show, Wendy told me that she was going to move most of our horses from Santa Fe to Hans' facility at Greystone so that the children could ride and show from his facility. She said Hans was going to let her build a barn and apartment there so that we would have a place of our own and so that the children could live there without the major commute

1

back and forth to New Mexico. I was not involved in the conversations between Hans and Wendy about the barn and apartment, but I know that Wendy believed this new structure at Greystone would be hers, for our sole and exclusive use.

7. I participated in the construction of what became five apartments at Greystone, and I brought in help from New Mexico. Together, with a friend of mine, Tommy Moylan, we laid most of the tile in our family's apartment and the four grooms' apartments, as well as laying the concrete board underlayment. We also worked on other construction projects related to the barn and apartments.

8. I was at Greystone often during the construction, sometimes for weeks at a time. After our family's apartment was finished in the summer of 2007, Wendy and one or more of the children were frequently at Greystone. I was also back and forth to Greystone a lot, transporting horses to and from shows. From the time construction began, Hans always referred to the barn and apartments as "Wendy's Barn" and "Wendy's Apartment."

9. Wendy seemed to get stressed and uncomfortable with Hans in 2008. Then, in summer 2008, I witnessed Hans bullying Wendy for more money for the first time. During that summer, I specifically remember one time when Wendy and I were in our apartment at Greystone, and Hans came into the apartment without knocking. He was demanding money from Wendy, and speaking loudly and forcefully – bullying her. Wendy went out of the living room onto the kitchen balcony. Hans followed her out and continued to argue with her. This was the first time I had seen Hans treat Wendy this way. It was inappropriate and very threatening. I began to better understand Wendy's stress and discomfort with Hans.

10. By late 2008, Wendy had become very upset about her relationship with Hans. While she and I generally did not discuss payments to Hans or his company, Malibu Equestrian Estate, Inc. ("MEE"), prior to the fall of 2008, by December 2008, Wendy told me that Hans was demanding money from her even though she had overpaid him. She was very upset and irritated because Hans would not provide her with underlying bills for charges he claimed and because he denied he had failed to credit all of her payments. She told me she felt used by a man she had trusted.

11. In early January 2009, Wendy and I, along with her assistant, John Sharp, and our daughter, Soleil, flew to Tennessee. Bryn had gone back to Greystone separately. We had three trucks and an 8-horse, 4-horse and 2-horse trailer in Tennessee and it was our intention to pick up all of our horses and board them at local area farms until we could get them back to Santa Fe. John Wendy, and I each had experience with trailering horses, and the three of us could drive trucks and trailers to move the horses. Even with all of us, it would take more than one trip, as we had about twenty horses at Greystone in January 2009.

12. We flew into Tennessee on January 7, 2008, and arrived by taxi at Greystone in the afternoon. Wendy was at her wit's end trying to talk to Hans. She felt bullied by him and was intimidated by him at that point. John Sharp had brought with him the billings Wendy had received from Hans, and records of Wendy's payments to Hans or his company. In addition to moving our horses out of Greystone, Wendy wanted John Sharp to try to get Hans to sit down and resolve the accounting. It was hoped that with John's management background, he would be able to reason with Hans and resolve the billing issues, as Wendy herself was too upset herself to speak to him. I did not have information about the accounting, but I had always thought Hans was a "buddy," and that he would be willing to talk to John and me.

13. On the morning of Thursday, January 8, 2009, John Sharp and I went to the barn around 9:00 a.m. to begin to load horses. Hans' ex-daughter in law, Beate Shart, and Daniella, a German woman who also worked for Hans, were at the barn and told us we had to wait for Hans before loading the horses.

14. A little while after we spoke to Beate and Daniella, Hans arrived. Hans wanted us to speak with him in his office. Hans told John Sharp, "Greg and I need some time alone to talk man-to-man about your wife [sic]." I did not know what this was about, but John left for a little while. While John was gone, Hans told me Wendy was acting crazy. I told him Wendy had been very distressed about the horses and what he claimed she owed him. He also talked about how well Bryn was riding and that she was going to start making money riding. It was a strange conversation.

15. When John Sharp came back, they started talking about the bookkeeping. John was telling Hans that he had not given Wendy all the credits she was due.

3

16.   Hans showed us a letter he said Wendy wrote him on December 4, 2008, where she talked about relinquishing horses and getting equipment back. John and I each told Hans that we had not seen the letter and asked him what he was going to do about the letter because we were told that we had come there to Greystone to remove horses at his request. He said Wendy owed him $244,000, and that Elke and his bookkeeper Marie had spent a long time working up the accountings. John again told Hans that he had a list of payments made by Wendy that were not included in Hans' account. Hans started getting aggravated. He took the position that if payments were not included in his accountings, then they had been paid for a prior year or for something unrelated to his totals. He said, "This is what it is." We left at that point and went back to our apartment.

17.   Later that day, John Sharp and I went back again and met with Hans in one of his offices. John was trying to talk to Hans about the discrepancies in Hans' billings and the missed credits owed to Wendy. Hans refused to look at what John had prepared or run an adding machine tape of charges and payments. He raised his voice and refused to listen to anything John said. The more John tried to get Hans to look at the accounting he had with him, the angrier Hans became. Hans stood up, waived his hands, clenched his fists, and raised his voice bullying us. He told us to get off of his property and that he would slaughter our horses if Wendy did not pay him some $200-something thousand dollars. I felt scared and was ready to leave. John sat there while Hans yelled at us, and he eventually got Hans to calm down.

18.   Hans just did not want to discuss the numbers. We then asked about the Kenworth truck and some of the equipment, and Hans said those were all gifts and gifts were not negotiable. We did not really get anywhere, and John and I left and went back to our apartment and reported our conversation to Wendy. Later, John left again to speak with Hans in his office without me there.

19.   To my knowledge, John Sharp approached Hans one more time on the evening of January 8th. There was some kind of supper party that night, and John walked over and had another conversation with Hans. John and I did not discuss his last conversation with Hans, but John did discuss it with Wendy.

4

Case 2:10-ap-02555-BR   Doc 36   Filed 02/08/12   Entered 02/08/12 13:15:20   Desc
Main Document    Page 6 of 8

20. I was quite fearful the night of January 8th because Hans had gotten so upset earlier that day. I know he kept guns at the property and I was worried because of his outburst – for the safety of my two children, Wendy and myself.

21. The morning of January 9th, I had a short conversation with Hans. Wendy and John Sharp left Greystone. I knew they were going to see a lawyer. Hans asked me where Wendy and John had gone. I told him that I thought they went to town, and when Hans insisted on knowing specifically where they went, I told him I thought they went to a bank. Hans got upset and asked why Wendy went to the bank instead of wiring him money like she usually did. I told him, "I don't know." Hans wanted to know if Wendy went to get a cashier's check, and again, I told him, "I don't know." I felt Hans would get very angry if I had told him the truth about where they went at the time, but I also felt he would get very angry when he found out that Wendy and John did not bring back the money he was demanding.

22. So when Wendy and John came back to Greystone, we got Bryn's saddle, our dogs, and our daughters and got in the car and left. We picked up my pickup truck from another location and went to the airport and flew home. We did not tell Hans we were leaving. I did not want to rile up Hans again. It was awful. I do not like being scared, and I would have left sooner if I could have.

23. Wendy learned in the Tennessee litigation in March 2009 that Hans was supposed to have sold several of our horses, but she did not believe it. She ran some ads to try to find the "sold horses" in one or more equine magazines, and we distributed copies at a couple of horse shows. In April 2009, I went up on a hill behind Greystone with a camera. I could see the arena where the horses were ridden at Greystone. I took photographs of five of our horses that Hans said had been sold and were not in his control. Those horses were on his property. There was an emergency hearing in Tennessee after we found those horses and the Tennessee court restrained Hans from removing those horses from Greystone.

24. I have held a commercial drivers license, issued in New Mexico, for six years. It permits me to drive only an automatic transmission. All of the large trucks (used to pull the large horse trailers) we had owned were automatic transmission. In 2007, Wendy bought a new 2008 Kenworth tractor to pull our horses. I understood it would be titled to me, as I would be the primary

5

driver. It was purchased with an automatic transmission because of my licensing restrictions. That is the Kenworth that Hans now claims as a gift from Wendy.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 6th day of February 2012, at Ocala, Florida.

*Greg Sadler*
GREG SADLER

**NOTE:** When using this form to indicate service of a proposed order, **DO NOT** list any person or entity in Category I. Proposed orders do not generate an NEF because only orders that have been entered are placed on the CM/ECF docket.

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is:
**15615 Alton Parkway, Suite 250, Irvine, CA 92618**

A true and correct copy of the foregoing document described as **DECLARATION OF PLAINTIFFS' WITNESS GREG SADLER** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner indicated below:

**I. TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING ("NEF")**: Pursuant to controlling General Order(s) and Local Bankruptcy Rule(s) ("LBR"), the foregoing document will be served by the court via NEF and hyperlink to the document. On **February 8, 2012**, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following person(s) are on the Electronic Mail Notice List to receive NEF transmission at the email address(es) indicated below:

- **Jesse S Finlayson**    jfinlayson@fwtrl.com, wmills@fwtrl.com
- **United States Trustee (LA)**    ustpregion16.la.ecf@usdoj.gov
- **Jason Wallach**    jwallach@gladstonemichel.com

☐ Service information continued on attached page

**II. SERVED BY U.S. MAIL OR OVERNIGHT MAIL** (indicate method for each person or entity served): On **February 8, 2012**, I served the following person(s) and/or entity(ies) at the last known address(es) in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States Mail, first class, postage prepaid, and/or with an overnight mail service addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

Presiding Judge:
Honorable Barry Russell
United States Bankruptcy Court
255 E. Temple Street, Suite 1660
Los Angeles, CA 90012
[BY OVERNIGHT MAIL]

Counsel for Defendants:
Elke Gordon Schardt
Law Office of Elke Gordon Schardt
44319 Lowtree Avenue
Lancaster, CA 93534
[BY U.S. MAIL]

☐ Service information continued on attached page

**III. SERVED BY PERSONAL DELIVERY, FACSIMILE TRANSMISSION OR EMAIL** (indicate method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on **Fill in Date**, I served the following person(s) and/or entity(ies) by personal delivery, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows. Listing the judge here constitutes a declaration that personal delivery on the judge will be completed no later than 24 hours after the document is filed.

☐ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

| 2/8/12 | Wendy S. Mills | */s/ Wendy S. Mills* |
|---|---|---|
| *Date* | *Type Name* | *Signature* |

This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*August 2010*    **F 9013-3.1.PROOF.SERVICE**