Main Document    Page 1 of 11

ELKE GORDON SCHARDT (State Bar # 152114)
LAW OFFICES OF ELKE GORDON SCHARDT
44319 Lowtree Avenue
Lancaster, CA 93534
Telephone:   (661) 940-5900
Facsimile:   (661) 940-5849
Email:       schardtlaws@verizon.net

JASON WALLACH (State Bar #75535)
GLADSTONE MICHEL
WEISBERG WILLNER & SLOANE, ALC
Mail Service:
  Post Office Box 92621
  Los Angeles, CA 90009-9998
Location:
  4551 Glencoe Avenue, Suite 300
  Marina del Rey, CA 90292-7925
Tel: (310) 821-9000 • Fax: (310) 775-8775
Email:       jwallach@gladstonemichel.com

Attorneys for Debtors
JOHN SHART and ELKE GORDON SCHARDT

## UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA, LOS ANGELES DIVISION

| | |
|---|---|
| In re: | CASE NO. 2:10-bk-29973-BR |
| JOHN SHART AND ELKE GORDON SCHARDT | CHAPTER 7 |
| Debtors. | Adv. Proc. No. 2:10-ap-02555-BR |
| | **DECLARATION OF DEFENDANTS' WITNESS GABRIELE KROPP** |
| WENDY HAIG, GREG SADLER and SHOW CASE 81, LLC, | **Trial/Evidentiary Hearing:** |
| Plaintiffs, | Date: April 25, 2012 |
| vs. | Time: 10:00 a.m. |
| JOHN SHART and ELKE GORDON SCHARDT, | Ctrm: 1668 |
| | 255 E. Temple Street |
| | Los Angeles, CA 90012 |
| Defendants. | Judge: Hon. Barry Russell |

Declaration of Defendants' Witness                     1

## DECLARATION OF GABRIELE KROPP

GABRIELE KROPP declares and states:

1. I have personal knowledge of the facts stated herein if called as a witness I could and would testify competently to the same.

2. I am the niece of debtor Elke Gordon Schardt ("my aunt"). I have known my aunt all my life and John Shart ("my uncle" or "Hans") since his marriage to my aunt, 32 years ago. I know that John Shart is an international horse dealer and I saw him from time to time on his buying trips in Europe.

3. I lived in Germany until the end of January 2008, although I visited my aunt and uncle in California, and in Tennessee several times. I have lived with my Aunt in California, and visited with my Uncle in Tennessee in the past four years as well for multiple visits together with my aunt in that time.

4. From all those contacts, I know that my aunt did not accompany John Shart on his business trips, and she usually visited the family by herself on a separate yearly trip when my grandmother, Elke Schardt's mother, was still alive. My grandmother died over 10 years ago.

5. I know that my aunt does not ride horses and is not involved in my uncle's horse business. I observed during my visits to the farm in Tennessee with my aunt that she has no interest in the horses and does not go into the stable to check on horses or see horses. Based on my observations the horses are strictly my uncle's interest and business.

6. I have read the Declaration of Wendy Haig submitted to the Court and state that the declaration contains many inaccuracies and interprets occurrences according to Wendy Haig.

7. In paragraph 39, of the Declaration of Wendy Haig, Ms. Haig claims that "In fall 2006, one of my daughters, Soleil, attended school in Germany." I know that the so called school Soleil attended was affiliated with the University of Heidelberg, and that Soleil studied at the University.

8. Paragraph 39 further claims "when I spoke to Hans prior to my daughter leaving about where she would live while in Germany, Hans insisted that she live with his niece, Gabriella Kroop, who spoke fluent English and apparently lived near Soleil's school. He

Declaration of Defendants' Witness                    2

proposed that I build out the basement in Ms. Kroop's property for Soleil. When I arrived in Germany to set up her living situation, I realized that Ms. Kroop lived too far away from Soleil's school (about 20 minutes by car) and so I set Soleil up in a student apartment in Heidelberg."

9. My uncle had called me sometime in June or July of 2006 to ask me if I and the rest of the family who all lived close by could keep an eye on the minor daughter of his client Wendy Haig while Soleil was studying in Heidelberg. John Shart did ask me if Soleil could live in my home, but I advised that I did not have any room, that it was very small and the one basement room was not built out. Wendy Haig and Soleil arrived on the 15th or 16th of August 2006 in Germany. Wendy Haig initially inquired if Soleil could live in my house, and I showed her the unfinished basement room. I also advised her I did not have the funds to build it out but if she wanted Soleil to stay with me and my family the build out would have to be done by her. Wendy Haig did not want to do any build outs and was able through contacts provided by the University in Heidelberg to set Soleil up in a very small furnished student studio. The landlord asked me to sign documents authorizing the automatic withdrawal of the rent from the bank account I had opened in my name but for Soleil. I did sign since otherwise she may not have had the apartment.

10. I state that living in Germany and renting apartments is not the same as in the United States. We do not have built in closets, carpeting, curtains, built in kitchens but the renter usually is required to do the build outs at the renter's expense. My house was rented and all amenities in the house were built in by my former husband and I, at our expense. I do not think that Wendy Haig was familiar with this.

11. In August 2006 I lived in a town called Schwetzingen which is located about 12 Kilometers (approx. 7 miles) from Heidelberg and public transportation by trolly, and bus between Schwetzingen and Heidelberg is very good. It is not a 20 minute ride by car as claimed by Ms. Haig but by trolley and public transportation.

12. In August 2006 I had agreed at the request of John Shart, and as an accommodation to a wealthy client of his, agreed to "look after" Haig's daughter Soleil and assist Wendy Haig when they first arrived in Germany. I had arranged an apartment Hotel for Soleil

Declaration of Defendants' Witness    3

1  and her mother. I took time off work to help with all the driving around . I went with them to the
2  bank, and for the cell phone. I showed Wendy Haig where to purchase household items for
3  Soleil such as dishes, linens, and assisted her in setting up Soleil's living situation. Wendy Haig
4  and Soleil arrived around August 15 or 16, 2006 and after 8 days in Germany Wendy Haig left
5  and Soleil was on her own. I found this very odd since I would not leave my 16 year old son
6  alone in a foreign country.
7      13.    Paragraph 39 of Wendy Haig's declaration also states .."Ms. Kroop co-signed for
8  Soleil on her German bank account and got her a cell phone since Soleil was under 18 and not a
9  resident of Germany, which were both requirements for obtaining a bank account and cell
10 phone." This statement is somewhat correct except that the facts were that Soleil Sadler was 16
11 years old at the time, was a minor, could not open a bank account in her name, could not order
12 utilities in her name, neither could her mother who was not a German citizen or resident, and all
13 her services were placed in my name. I did not co-sign on the bank account or the cell phone
14 contract, they were in my name.
15     14.    During Soleil's stay in Germany I kept the bank account for Soleil and made sure
16 her bills were paid. I also had insisted on Ms. Haig signing an authorization for me to take care
17 of Soleil in a medical emergency. Soleil Sadler also began dating my son when she was in
18 Germany and spent almost every day in my home. I am not aware that she tutored my son.
19 Soleil did not have a car, could not drive in Germany, and took public transportation on an
20 almost daily basis to get to my house. She would stay in Heidelberg if she had examinations the
21 next day. Having an additional person in the home drained me financially. My daily expenses
22 increased and I ended up in debt because I could not take care of an additional person in my
23 household financially on my income.
24     15.    While Soleil Sadler was in Germany Wendy Haig did not inquire with me how
25 she was doing. I do know from Soleil's cell phone bills that Soleil talked to her mother, but I
26 found it odd that Ms. Haig would not even inquire with a responsible adult how Soleil was. Ms.
27 Haig has never offered to pay me for my services, or acknowledged the service I provided to her
28 for her daughter Soleil, while Soleil was under age and sent to and left in Germany by herself. I

Declaration of Defendants' Witness    4

1. did not call Wendy Haig at any time while Soleil was in Germany, I had no reason to call her and did not have her telephone number.

16. In August 2006, while Haig was in Germany, delivering her daughter Soleil to me, she exclaimed to me that she was very happy with the horses she had bought from John Shart, and that she had made money on horse sales for the first time. Haig did not express to me any trouble or problems in August 2006 between her and John Shart. Soleil Sadler during the entire time she was at my home did not talk about her mother building a barn in Tennessee or any plans of moving to Tennessee.

17. In 2007 my father, his wife and I came to Tennessee to celebrate my aunt's 60th birthday with her. I saw Wendy Haig at the Farm in Tennessee on February 13th 2007. I do not think we spoke at that time. Ms. Haig, Greg Sadler, Bryn Sadler, her brother Alexander, and two men who were identified as the pilots of Haig's private jet were there. On February 14th, Haig, my uncle, grooms, horses and equipment left for the horseshow in Gulfport Mississippi. We were visiting for three weeks and my uncle returned once during that time to bring horses back and pick up different ones to take to Gulfport. My father, his wife and I were at the farm until the first week in March 2007.

18. In February 2007, all buildings were on the Tennessee farm already, except the one barn which was built later and which I have learned Ms. Haig claims she built. When I was at the farm in February 2007 the buildings there were: A 100 year old yellow farmhouse, a double wide mobile home for Beate, a stable with a built out loft where my uncle and aunt stayed, and a barn with tackroom, office, feedroom, and bathroom and stalls housing about 14 horses. There was a riding arena, a large garage to store equipment, a viewing room overlooking the indoor arena, and a guestroom above. There also were two grooms' apartments on the top of the arena. The outside riding ring was there, the paddocks were fenced in as were the pastures. When I left the farm in 2007, in the first week of March, there was no new construction, nor had a new barn been started. My aunt left at the same time I did. I recall that my aunt said she was glad in February 2007 that the farm was finished and at no time did I hear her or my uncle mention a second barn.

Declaration of Defendants' Witness    5

19. I came to the U.S. one more time in late 2007 to visit my aunt in Acton, California. I came to the United States in early 2008 to live, and travelled with my aunt to Tennessee a few times. When we were at the farm in Tennessee Wendy Haig was usually not there, except in the fall of 2008 I do recall her being at the farm for a day or two after my aunt and I arrived there. It was during that time that Wendy Haig purchased the farm close to Greystone at an auction sale.

20. My uncle and I had gone to the auction sale early in the morning. I saw him sign in, and get his number for the auction. I walked around with him. We looked at equipment. I looked at the house, and spoke with the owners. When the auction started I was with my uncle and he bid to purchase the home and 35 acres with it. Other people were bidding on the rest of the farmland. While the bidding was ongoing Wendy Haig came to the auction as well. Wendy Haig did not sign up for an auction number and when she bid on the entire farm to purchase it she used my uncle's number. I read in her declaration that she claims my uncle caused the auctioneer to prepare documents in his name, but the fact is that she did not have her own number but used his. My uncle purchased some farm equipment and an old Corvette at the auction, and Wendy Haig had outbid him on the land and house purchase.

21. I spoke with Wendy Haig at the auction about our children, but nothing else. Back at the farm in the afternoon Wendy Haig invited me to the apartment for a cup of coffee. We talked about the children some more, and Wendy Haig tried to question me about the relationship between my aunt and uncle. She asked me why they were "arguing a lot?" I told her not to worry about it since as long as I had known them they argued and in retrospect the question from Haig was odd. After these remarks Wendy Haig became very quiet, did not talk much anymore and we ended our coffee chat quickly.

22. I know my aunt very well, and know that she is headstrong, very private and does not like anyone in her home or around her unless they are invited. I am certain that she knew nothing about a second barn being built or that Wendy Haig and her children planned on living at the farm. When my aunt and I visited the farm Wendy Haig usually was gone and many times everyone was at a horseshow and we were there alone. My aunt would never allow Haig to build

Declaration of Defendants' Witness                                    6

a barn on her land. I remember my aunt getting upset about this additional barn building (after it was built) because it increased her property taxes. I did not see my aunt speak to or interact with Wendy Haig at the farm, nor did she have contact with the Haig children at the farm.

23. In 2008 I came to the US to live, and was present during all visits of my aunt in Tennessee. I travelled to Greystone Equestrian Center ("the farm") in Tennessee with my aunt on December 18, 2008 and returned on January 5, 2009. We arrived at 4 a.m. in the morning of December 18, 2008 because our flight had been delayed. My uncle John Shart picked us up in Nashville. We did not see Haig on December 18th.

24. I read in Wendy Haig's declaration that she claims to be afraid of John Shart. It is not believable to me. She sent her daughter Bryn to Tennessee on January 2, 2008. It is also false that John Shart picked Bryn up at the airport. I was driving the car, Elke Schardt and her close friend Ann Cushing were passengers and I drove us to the Nashville airport to pick up Bryn Sadler and Beate Shart who was returning on the same date and time from Germany. We picked up Bryn and Beate and drove back to the farm.

25. Driving back from the airport Bryn was seated in the back and was talking with Beate and Ann Cushing. I recall that her cell phone rang and that Bryn spoke with her mother. I did not hear the conversation but it was short.

26. I spent Christmas 2008 with my aunt and uncle, and others at the farm. My aunt and uncle have caller ID on their telephone and the caller is displayed on the television screen. During Christmas and over New Year I witnessed the constant telephone calls from Wendy Haig. The calls on the caller ID were from the 505 New Mexico area code, and began from morning to evening. The phone would first ring in my family's apartment and when no one picked up, the office phone would ring. This sequence would repeat itself over and over. While celebrating Christmas the telephone in the viewing room/bar in the riding arena rang, and the area code on the ID was 505. I was informed by Beate and Daniella that Wendy Haig called them. I observed my aunt getting very upset about these constant calls and interruption in the family holiday. My aunt and I were in the apartment many times when the phone would ring time after time, and my aunt would not pick up the call because it was Wendy Haig calling. I

Declaration of Defendants' Witness                         7

observed my aunt getting very aggravated about this because in our family the holidays are traditionally for family, not for business or strangers. The amount of telephone calls were not normal in my opinion and my aunt unplugged all phones over Christmas just to have peace. My aunt, her friend Ann Cushing and I spent time in Nashville, sightseeing and my uncle spent time with the horses and in his office. I learned over such time that Wendy Haig and my uncle were in a disagreement over monies Haig owed for board, and I observed him being very preoccupied. John Shart did not speak much with my aunt and my aunt was very annoyed about Wendy Haig sending her daughter to the farm and we having to pick her up.

27. My aunt and I left the farm on January 5th, 2009 to fly back to California. It is my understanding that the next day Wendy Haig came to the farm.

28. I am aware of the lawsuit filed by Haig in the Tennessee court against John Shart, Elke Gordon Schardt and Malibu Equestrian Estate Inc. doing business as Greystone Equestrian Center ("GEC").

29. I know that John Shart in 2008-2009 had Susan Rhea [rhea?]working in his office. I spoke with her on many occasions. I saw her write checks for him and she worked on the computer. Susan Rhae was at Greystone until the beginning of May 2009.

30. My aunt and I travelled to Tennessee in April/May 2009 together and in preparation of putting all documents together for an accounting in the lawsuit. Susan Rhae printed out the Excell worksheets and I was to pull all invoices and checks and match them up. I am not an accountant, was not employed in Tennessee, but I assisted in compiling documents for the lawsuit. My aunt left two weeks before me since she had to return to her own work. I copied bills, checks, and reviewed documents to corroborate or correct the entries in an accounting prepared by GEC, reflecting all the transactions, money and charges between GEC and Haig between 2005 and early 2009. I also worked with Beate Kuska Shart, who had kept many of the records on this project. Beate had a log of the horse shows and horses and shoeing and we compared this to the printouts Susan had given us.

31. I examined a large volume of documents and records, and copied documents and checks matching or supporting such bills and documents. My examination of documents and

Declaration of Defendants' Witness    8

1  bills indicates that my uncle wrote a check for virtually every penny spent in his business and has

2  documentation for it. I am not an accountant and if I made any addition errors they were

3  inadvertent and not on purpose. I was not directed by my aunt and I know that my aunt *did not*

4  do any accounting for her husband. I worked in her law office in California and I know that she

5  was not then nor before involved in my uncle's business. The horse business as long as I can

6  recall was always run by my uncle and Beate was riding and showing the horses. My uncle also

7  was not involved in Elke Schardt's business.

8      32.    The accounting that I provided is the compilation of information from documents

9  I reviewed, located at my uncle's office, bills prepared by Susan Rhee and printouts of the check

10  register Susan kept.

11      33.    I am not an accountant and cannot verify the work of former employees of my

12  uncle. However, the accounting compiled to the best of my ability and knowledge is accurate

13  and completely backed up by the bills, checks and records of GEC through the end of 2008.

14      34.    I know that my uncle is a horse dealer and that he has bought and imported

15  European competition horses for as long as I have known him. I know that Haig purchased

16  horses from him, because she told me so in 2006. Haig also told me how happy she was with her

17  purchases. She did not at any time express that she distrusted my uncle, that she was afraid of

18  him, but it seemed that they had a close relationship and she was happy.

19      35.    I observed John Shart's decline in health in 2008, 2009 and have knowledge of the

20  frequent court appearances in Tennessee in 2009, 2010 , and now here in California.

GLADSTONE MICHEL
WEISBERG WILLNER & SLOANE, ALC
P.O. Box 92621
Los Angeles, CA 90009-9998

Declaration of Defendants' Witness        9

36. I accompanied my aunt to the initial debtor's examination when she was still in a Chapter 11 bankruptcy. John Shart was ill and not able to attend. I sat behind Haig and her attorney Patricia R. Young. I overheard Patricia Young referring to Mr. Shart's health as "his imaginary health problems." I observed Patricia R. Young and Haig laughing about the comment. Haig saw me but pretended not to know me.

37. I was present at the farm when Haig's husband picked up the horse Cincinnati and another one from the farm. I took photographs to document the pick up to prevent subsequent claims. I saw Greg Sadler and John Shart sitting in front of Mr. Shart's office and talking with each other. They both looked relaxed. I did not observe any animosity or fear on Mr. Sadler's part.

38. In March 2011 my uncle had a devastating stoke. I flew to Tennessee since my aunt was not able to leave immediately. He was in a coma for two months. He has brain damage and will never be able to work again.

39. I have read the declarations of Haig and saw that she claims my aunt conspired with my uncle. I declare that nothing is further from the truth. I have never known my aunt being involved in the horse business, and she has little knowledge of horses. I do know that horsepeople are not her interest or people. I have not at any time during the past several years seen Haig have a conversation with my aunt, and when Haig was in Germany in 2006 she never mentioned my aunt.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Dated: February ___, 2012

*Gabriele Kropp*
GABRIELE KROPP

GLADSTONE MICHEL WEISBERG WILLNER & SLOANE, ALC
P.O. Box 92621
Los Angeles, CA 90009-9998

| In re:<br>JOHN SHART and ELKE GORDON SCHARDT,<br>Debtor(s).<br><br>HAIG, et al. v. SHART, et al. | CHAPTER 11<br>CASE NUMBER: 2:10-bk-29973-BR<br><br>ADVERSARY PROCEEDING<br>CASE NUMBER: 2:10-ap-02555 BR |
|---|---|

**NOTE:** When using this form to indicate service of a proposed order, **DO NOT** list any person or entity in Category I. Proposed orders do not generate an NEF because only orders that have been entered are placed on the CM/ECF docket.

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is: 4551 Glencoe Ave., Suite 300, Marina del Rey, CA 90292

The foregoing document described as **DECLARATION OF DEFENDANTS' WITNESS GABRIELE KROPP** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner indicated below:

I. **TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING ("NEF")** – Pursuant to controlling General Order(s) and Local Bankruptcy Rule(s) ("LBR"), the foregoing document will be served by the court via NEF and hyperlink to the document. On **2/22/2012**, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following person(s) are on the Electronic Mail Notice List to receive NEF transmission at the email address(es) indicated below:

Jesse S. Finlayson                         jfinlayson@fwtrl.com, wmills@fwtrl.com
United States Trustee (LA)           Ustpregion16.la.ecf@usdoj.gov

☐ Service information continued on attached page

II. **SERVED BY U.S. MAIL OR OVERNIGHT MAIL**(indicate method for each person or entity served)**:**
On **2/22/2012**, I served the following person(s) and/or entity(ies) at the last known address(es) in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States Mail, first class, postage prepaid, and/or with an overnight mail service addressed as follows. *Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.*

Elke Gordon Schardt, Law Office Of Elke Gordon Schardt, 44319 Lawtree Ave., Lancaster, CA 93534 (US Mail)

☐ Service information continued on attached page

III. **SERVED BY PERSONAL DELIVERY, FACSIMILE TRANSMISSION OR EMAIL** (indicate method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on **2/22/2012**, I served the following person(s) and/or entity(ies) by personal delivery, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows. *Listing the judge here constitutes a declaration that personal delivery on the judge will be completed no later than 24 hours after the document is filed.*

The Hon. Barry Russell, US Bankruptcy Court, 255 E. Temple St., Crtrm 1668, L.A., CA 90012

☐ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

| 2/22/2012 | GIOIA IWATA | /s/ |
|---|---|---|
| Date | Type Name | Signature |

pos for filings 2.22.2012.doc                                                    1