# FOR PUBLICATION

FILED & ENTERED

JAN 29 2014

CLERK U.S. BANKRUPTCY COURT
Central District of California
BY fortier      DEPUTY CLERK

**UNITED STATES BANKRUPTCY COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**LOS ANGELES DIVISION**

| | |
|---|---|
| In re:<br><br>John Shart and Elke Gordon-Schardt,<br><br><div align="right">Debtor(s).</div> | CHAPTER 7<br><br>Case No.:  2:10-bk-29973-BR<br>Adv. No:    2:10-ap-02555-BR<br><br>**MEMORANDUM OF DECISION DETERMINING THAT IMPUTATION OF FRAUD COMMITTED BY DEBTOR/HUSBAND TO DEBTOR/SPOUSE IS UNWARRANTED UNDER § 523(a)(2)(A)** |
| Wendy Haig, Greg Sadler, and Showcase 81, LLC,<br><br><div align="right">Plaintiff(s),</div><br>      v.<br><br>John Shart and Elke Gordon-Schardt,<br><br><div align="right">Defendant(s).</div> | Date:         December 11, 2013<br>Time:         10:00 a.m.<br>Courtroom:  1660<br>                    255 East Temple Street<br>                    Los Angeles, CA 90012 |

    This matter is before the Court on remand from the Bankruptcy Appellate

Panel, which stated:

        . . . While we AFFIRM the bankruptcy court's

> determination that Ms. Schardt was not directly liable
> for fraud, we VACATE in part the bankruptcy court's
> judgment and REMAND the action to the bankruptcy
> court to consider whether Ms. Schardt's spouse's fraud
> may be imputed to her.

BAP Memorandum, 2:6 – 2:10.


For the reasons stated below, I am of the firm belief that imputation of the fraud of John Shart to his wife Elke Gordon-Schardt is unwarranted under § 523(a)(2)(A) and is hostile to the well accepted principle that Congress intended to enact bankruptcy law "by which the honest citizen may be relieved from the burden of hopeless insolvency." Neal v. Clark, 95 U.S. 704, 709 (1877).


The Origin of the Imputation of Fraud in Non-Dischargeability Proceedings

The source of the imputation of fraud to an otherwise innocent person is Strang v. Bradner, 114 U.S. 555 (1885), a five page opinion in which the U.S. Supreme Court held that under § 33 of the Bankruptcy Act of 1867, the fraud of one partner could be imputed to the other partner for the purpose of exceptions to discharge. The entire discussion of the imputation of fraud is found in the last paragraph of the decision. Unfortunately, it is purely conclusory.

I have no quarrel with its statement that outside of bankruptcy a partner is liable for the fraud of another partner and its citations to cases standing for that general proposition. However, I strongly disagree with its conclusion and giant leap that, therefore, the fraud could be imputed to the partner for purposes of exceptions to discharge. This makes no sense to me. Of course the partners were liable for all partnership debts. However, there was no reason to equate liability with exceptions to discharge.

The last paragraph of the opinion states:

> The only other question to be determined is whether
> the defendants John B. Holland and Joseph Holland
> can be held liable for the false and fraudulent

representations of their partner, it being conceded that they were not made by their direction nor with their knowledge.  Whether this action be regarded as one to recover damages for the deceit practiced upon the plaintiffs, or as one to recover the amount of a debt created by fraud upon the part of Strang, we are of opinion that his fraud is to be imputed, for the purposes of the action, to all members of his firm.  The transaction between him and the plaintiffs is to be deemed a partnership transaction, because, in addition to his representation that the notes were for the benefit of his firm, he had, by virtue of his agency for the partnership, and as between the firm and those dealing with it in good faith, authority to negotiate for promissory notes and other securities for its use.  Each partner was the agent and representative of the firm with reference to all business within the scope of the partnership.  And if, in the conduct of partnership business, and with reference thereto, one partner makes false or fraudulent misrepresentations of fact to the injury of innocent persons who deal with him as representing the firm, and without notice of any limitations upon his general authority, his partners cannot escape pecuniary responsibility therefor upon the ground that such misrepresentations were made without their knowledge.  This is especially so when, as in the case before us, the partners, who were not themselves guilty of wrong, received and appropriated the fruits of the fraudulent conduct of their associate in business.  *Stockwell v. U.S.* 13 Wall. 547, 548; Story, Partn. §§ 1, 102, 103, 107, 108, 166, 168; *Chester v. Dickerson*, 54 N.Y. 1; *Locke v. Stearns*, 1 Metc. 560; *Lothrop v. Adams*, 133 Mass. 481; *Blight's Heirs v. Tobin*, 7 T. B. Mon. 617; *Durant v. Rogers*, 87 Ill. 508; Colly. Partn. (Wood's Ed.) §§ 446, 449, 450; Lindl. Partn. (Ewell's Ed.) § 302.

Id. at 561-62.

Eight years prior to Strang, the U.S. Supreme Court in Neal v. Clark, 95 U.S. 704 (1877) held that "fraud" means actual or positive fraud, and not just fraud implied by law.  Neal v. Clark was decided under the Bankruptcy Act of 1867. That Act provided that "no debt created by the fraud or embezzlement of the bankrupt, or by defalcation as a public officer, or while acting in a fiduciary

1    capacity, shall be discharged under this Act." Id. at 706.

2        The facts of Neal v. Clark are straightforward.  Neal bought two bonds from

3    an estate in a transaction with the estate executor.  Subsequently, Clark became

4    a surety of the estate and sued the executor, Neal, and others alleging that the

5    bonds had been sold below market value and the sale thus constituted a

6    fraudulent waste of estate assets.  The lower court agreed, finding Neal guilty of

7    constructive, but not actual, fraud.  After he purchased the bonds, but before Clark

8    filed suit, Neal was adjudicated a bankrupt under the bankruptcy law of 1867.  He

9    therefore pleaded his bankruptcy discharge as a defense in Clark's action

10   regarding the bonds.

11       Speaking for the Court, Justice Harlan announced that Congress intended

12   to enact bankruptcy law "by which the honest citizen may be relieved from the

13   burden of hopeless insolvency."  Id. at 709.  For a debt to be non-dischargeable

14   because it was created by "fraud," the fraud had to be a "positive fraud, or fraud in

15   fact, involving moral turpitude or intentional wrong … and not implied fraud, or

16   implied in law, which exist without the imputation of bad faith or immorality."  Id.

17       Recent U.S. Supreme Court cases make it clear that imputation of fraud

18   would not be proper under § 523(a)(2).  Most recently, in Bullock v.

19   BankChampaign, N.A., 133 S.Ct. 1754 (2013), the Supreme Court held that the

20   term "defalcation," as used in the section of the Bankruptcy Code excepting from

21   discharge a debt "for fraud or defalcation while acting in a fiduciary capacity,

22   embezzlement, or larceny," requires a culpable state of mind requirement

23   involving knowledge of, or gross recklessness in respect to, the improper nature

24   of the relevant fiduciary behavior.

25       The Supreme Court, in reaching its decision, referred to Justice Harlan's

26   opinion in Neal v. Clark:

27               We base our approach and our answer upon
             one of this Court's precedents. In 1878, this Court
28           interpreted the related statutory term "fraud" in the

portion of the Bankruptcy Code laying out exceptions to discharge. Justice Harlan wrote for the Court:

> "[D]ebts created by 'fraud' are associated directly with debts created by 'embezzlement.' Such association justifies, if it does not imperatively require, the conclusion that the 'fraud' referred to in that section means positive fraud, or fraud in fact, involving moral turpitude or intentional wrong, as does embezzlement; and not implied fraud, or fraud in law, which may exist without the imputation of bad faith or immorality. *Neal v. Clark*, 97 U.S. 704, 709, 24 L.Ed. 586 (1878).

We believe that the statutory term "defalcation" should be treated similarly.

Thus, where the conduct at issue does not involve bad faith, moral turpitude, or other immoral conduct, the term requires an intentional wrong. We include as intentional not only conduct that the fiduciary knows is improper but also reckless conduct of the kind that the criminal law often treats as the equivalent. Thus, we include reckless conduct of the kind set forth in the Model Penal Code. Where actual knowledge of wrongdoing is lacking, we consider conduct as equivalent if the fiduciary "consciously disregards" (or is willfully blind to) "a substantial and unjustifiable risk" that his conduct will turn out to violate a fiduciary duty. ALI, Model Penal Code § 2.02(2)(c), p. 226 (1985). See *id.*, § 2.02 Comment 9, at 248 (explaining that the Model Penal Code's definition of "knowledge" was designed to include " 'wilful blindness' "). That risk "must be of such a nature and degree that, considering the nature and purpose of the actor's conduct and the circumstances known to him, its disregard involves *a gross deviation* from the standard of conduct that a law-abiding person would observe in the actor's situation." *Id.*, § 2.02(2)(c), at 226 (emphasis added). Cf. *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 194, n. 12, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976) (defining scienter for securities law purposes as "a mental state embracing intent to deceive, manipulate, or defraud").

1  Bullock, 133 S.Ct. at 1759-60.

2      The Supreme Court further stated:

3          Third, the interpretation is consistent with the
4  long-standing principle that "exceptions to discharge
   'should be confined to those plainly expressed.' "
5  *Kawaauhau v. Geiger,* 523 U.S. 57, 62, 118 S.Ct. 974,
   140 L.Ed.2d 90 (1998) (quoting *Gleason v. Thaw,* 236
6  U.S. 558, 562, 35 S.Ct. 287, 59 L.Ed. 717 (1915)).
   See *Local Loan Co. v. Hunt,* 292 U.S. 234, 244, 54
7  S.Ct. 695, 78 L.Ed. 1230 (1934); *Neal, supra,* at 709.
   It is also consistent with a set of statutory exceptions
8  that Congress normally confines to circumstances
   where strong, special policy considerations, such as
9  the presence of fault, argue for preserving the debt,
   thereby benefiting, for example, a typically more
10 honest creditor.  See, *e.g.,* 11 U.S.C. § 523(a)(2)(A),
   (a)(2)(B), (a)(6), (a)(9) (fault).  See also, *e.g.,* §
11 523(a)(1), (a)(7), (a)(14), (a)(14A) (taxes); § 523(a)(8)
12 (educational loans); § 523(a)(15) (spousal and child
   support).
13

14 Id. at 1760-61.

15     The Supreme Court followed similar reasoning in <u>Kawaauhau v. Geiger</u>,

16 523 U.S. 57 (1998), with regard to § 523(a)(6) "willful and malicious injury."  The

17 Supreme Court held that only acts with the intent to cause injury are sufficient for

18 non-dischargeability under 523(a)(6) and "reckless" and "negligent" acts are not.

19 This echoes the Supreme Court holdings that intent and fault are the essential

20 factors for non-dischargeability (at least for § 523(a)(2)(4) and (6)).

21     Moreover, to deny an innocent partner of her discharge based solely on the

22 imputation of fraud runs counter to a basic principle of the Bankruptcy Code,

23 which is to give an "honest debtor" a "fresh start."  The Supreme Court recently

24 emphasized this underlying principle stating "This Court has certainly

25 acknowledged that a central purpose of the Code is to provide a procedure by

26 which certain insolvent debtors can reorder their affairs, make peace with their

27 creditors, and enjoy 'a new opportunity in life with a clear field for future effort,

28 unhampered by the pressure and discouragement of preexisting debt.'"  <u>Grogan v.</u>

1  *Garner*, 498 U.S. 279, 286 (1991) (quoting *Local Loan Co. v. Hunt*, 292 U.S. 234,

2  244 (1934)).

3          In light of the Supreme Court's recent rulings in *Grogan*, *Geiger*, and

4  especially *Bullock*, I am certain that given the opportunity today, the Supreme

5  Court would not impute fraud to preclude dischargeability to an otherwise innocent

6  partner who had no culpability other than being a partner.

7

8  Legislative History

9          When Congress enacted the Bankruptcy Code of 1978, it made few

10  changes to what was formerly § 17 of the Bankruptcy Act.  Former § 17 rendered

11  an obligation incurred as a result of fraud non-dischargeable.  The legislative

12  history provides that "[this] provision is modified only slightly from current section

13  17(a)(2).  First, 'actual fraud' is added as a ground for exception from discharge."

14  S. Rep. No.989, 95th Cong., 2d Sess. 77-79, *reprinted in* 1978 U.S.C.C.A.N.

15  5787, 5864.  The legislative history further evidences that "Subparagraph (A) is

16  intended to codify current law, e.g., *Neal v. Clark,* 95 U.S. 704 (1887), which

17  interprets 'fraud' to mean actual or positive fraud rather than fraud implied by law."

18  124 Cong. Rec. H11,095-96 (Daily Ed. Sept. 28, 1978); 124 Cong. Rec. S17,412-

19  13 (Daily Ed. Oct. 6, 1978) (remarks of Rep. Edwards and Sen. DeConcini).

20  Congress clearly approved the *Neal v. Clark* "actual fraud" requirement, but made

21  no mention of *Strang v. Bradner*, which held that an innocent debtor could not

22  discharge a debt incurred by the fraudulent actions of a partner and merely

23  imputed to the debtor.  Congress had ample opportunity to codify *Strang,* just as

24  they had done for *Neal,* but Congress made no attempt to do so.

25

26  Ninth Circuit Cases

27          The Ninth Circuit has only dealt with the issue of imputing fraud for non-

28  dischargeability purposes in two cases:  *In re Cecchini*, 780 F.2d 1440 (1986),

1   and In re Lansford, 822 F.2d 902 (1987).

2       In In re Cecchini, a six page opinion, the Ninth Circuit found that the

3   debtor's conversion of a hotel owner's funds was non-dischargeable under §

4   523(a)(6) as "willful and malicious conduct."  The Court also held that the partners'

5   knowledge and intent was imputed to another debtor and thus non-dischargeable.

6   The Ninth Circuit stated:

7               Second, although there is no evidence in the
8           record concerning Robustelli's direct involvement in
            converting the funds, it is undisputed that Robustelli
9           and Cecchini were partners and in the ordinary course
            of the business of the partnership when he converted
10          the funds.  Robustelli, at a minimum, participated in the
            benefits of the conversion, as evidenced by his
11          entering into the stipulated judgment in favor of
            plaintiff. Therefore, applying basic partnership law,
12          Cecchini's knowledge and intent are imputed to
            Robustelli.  [citation omitted]  We find that, as to
13          Robustelli as well, the debt cannot be discharged."

14  Id. at 1444.

15      The Ninth Circuit offered no analysis as to why it is proper to impute willful

16  and malicious conduct in a non-dischargeability context.  Again, no one disputes

17  that under state law a person is liable for their partners "wilful and malicious

18  conduct," but to impute this for non-dischargeability purposes in a bankruptcy

19  context is an unfounded leap.  This case has generated much criticism, and less

20  than a year later the Ninth Circuit decided In re Lansford, 822 F.2d 902 (1987),

21  which appears to put in serious question the viability of Cecchini.

22      In re Lansford, authored by now-Supreme Court Justice Kennedy, dealt

23  with fraud under § 523(a)(2).  The debtor and his wife sold a restaurant after

24  submitting fraudulent documents to the seller.  The debtors later filed bankruptcy

25  and still owed $235,000 of unsecured debt to the sellers.  The Ninth Circuit found

26  that both the debtor and his wife had committed fraud and therefore they could not

27  receive a discharge for their debt, which was created by their fraud.

28

Nevertheless, Judge Kennedy, speaking for the Ninth Circuit, went out of his way to discuss the possibility of basing non-dischargeability on agency principles, i.e., imputation of fraud.

> Were the record devoid of evidence from which to infer that Cecily Lansford was in some way culpably responsible for the fraudulent financial statement, we would be faced with the difficult legal issue of whether her debt would nevertheless be non-dischargeable by virtue of principles of agency. In *In re Cecchini*, 780 F.2d 1440 (9th Cir.1986), this court cited basic partnership law to hold that a business partner's debt was non-dischargeable because he had "participated in the benefits" of his partner's misconduct, which had been undertaken on behalf of the partnership and in the ordinary course of business. *Id*. at 1444. Were we to rely on strict agency or partnership principles, we might be forced to conclude that Cecily Lansford's debt is non-dischargeable regardless of her knowledge of the fraud or her own culpability. In light of the bankruptcy code's purpose of providing a fresh start, *see Gleason v. Thaw*, 236 U.S. 558, 562, 35 S.Ct. 287, 289, 59 L.Ed. 717 (1915), and the decisions of other circuits refusing to apply agency principles absent some culpability on the part of the party to be charged, *see In re Walker*, 726 F.2d 452, 454 (8th Cir.1984) (per curiam); *In re Bardwell*, 610 F.2d 228, 229 (5th Cir.1980) (per curiam); *David v. Annapolis Banking & Trust Co.*, 209 F.2d 343, 344 (4th Cir.1953); *In re Lovich*, 117 F.2d 612, 614-15 (2d Cir.1941), we believe the breadth of the proposition stated in *Cecchini* deserves more thorough consideration before its application to the circumstances presented in this case.

Lansford, 822 F.2d at 904-05.

More recently, the Ninth Circuit echoed the same sentiment in In re Sherman, 658 F.3d 1009 (9th Cir. 2011). The question there was whether the exception to discharge for violations of state or federal securities laws under § 523(a)(19) applies when the debtor himself is not culpable for the securities violation that caused the debt. The debtor was an attorney who represented some companies guilty of violating securities laws. The debtor had some of the

companies' money which he had not earned and was forced to disgorge.  The

debtor filed bankruptcy and the issue was whether this debt was non-

dischargeable under § 523(a)(19).  It is important to note that the debtor was not

found to have himself violated any of the securities laws.  The Court stated:

> We hold that § 523(a)(19) prevents the discharge of
> debts for securities-related wrongdoings only in
> cases where the debtor is responsible for that
> wrongdoing. Debtors who may have received funds
> derived from a securities violation remain entitled to
> a complete discharge or any resulting disgorgement
> order.

Id. at p. 1019.

The following analysis in Sherman indicates to me that the Ninth Circuit

would not allow imputation of fraud regarding § 523(a)(2)(A).  The Court stated:

> For example, 523(a)(2)(A) creates an
> exception to discharge for debts "for money,
> property, services, or an extension, renewal, or
> refinancing of credit, to the extent obtained by ...
> actual fraud."  Even though the text of the statute
> does not state that the fraudulent conduct must have
> been the debtor's, we have nonetheless incorporated
> that assumption into our understanding of the
> provision. *See, e.g., Ghomeshi v. Sabban (In re
> Sabban),* 600 F.3d 1219, 1222 (9th Cir.2010)
> ("[M]aking out a claim of non-dischargeability under §
> 523(a)(2)(A) requires the creditor to demonstrate ...
> [that] *the debtor* made representations; ... that at the
> time he knew they were false; [and] that he made
> them with the intention and purpose of deceiving the
> creditor." (emphasis added)); *Citibank v. Eashai (In
> re Eashai),* 87 F.3d 1082, 1086 (9th Cir.1996) ("[T]o
> prove actual fraud, a creditor must establish ... that
> *the debtor* made the representations...." (emphasis
> added)).  In fact, we have recently suggested that the
> debtor's involvement in the fraudulent activity might
> be the *only* relevant consideration in determining
> whether the exception applies.  *See Sabban*, 600
> F.3d at 1222 (holding that a debtor need not have
> received a benefit from the fraudulent activity in order
> for § 523(a)(2)(A) to prevent a discharge).
>
> We have read § 523(a)(4) in a similar fashion.

Although the statute only prohibits the discharge of debts "for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny"— again, without any mention that the misconduct must have been by the debtor—we have strongly suggested that it applies only in cases where the debtor is responsible for the misconduct. *See, e.g., CalMicro, Inc. v. Cantrell (In re Cantrell),* 329 F.3d 1119, 1128 (9th Cir.2003) (rejecting a claim under § 523(a)(4) because the defendant was not a fiduciary).

A contrary reading of these provisions would extend the discharge exceptions to the "honest but unfortunate debtor," *Local Loan Co. v. Hunt,* 292 U.S. 234, 244, 54 S.Ct. 695, 78 L.Ed. 1230 (1934), in cases where the debtor was unwittingly involved with, and unknowingly received benefits from, a wrongdoer. For example, suppose we had not construed § 523(a)(2)(A) to apply only in those cases where the debtor committed the fraud. Suppose, further, that a bank loaned money to an innocent person under the express condition that the loan be guaranteed by a third party who had greater assets. If the third party lies about his assets in order to qualify to be the guarantor, then the borrower will have, in effect, obtained "money ... by ... false pretenses, a false representation, or actual fraud," even if she did not know or have reason to know about the guarantor's misconduct. If she is subsequently unable to repay her loan and is driven to bankruptcy, we think it would contravene the "fresh start" purposes of the system to deny her a discharge on the basis of a third party's misconduct.

Admittedly, nothing in the text of any of these provisions makes it clear that the exceptions should apply only to debtors who are responsible for the wrongdoing that caused the debt. However, the government's rule would require us to adopt the opposite presumption: that exceptions should be applied broadly unless expressly confined to guilty debtors. We do not think the structure of § 523, taken alone, enables us to resolve this question. We must therefore examine § 523(a)(19) in light of the purposes of the Bankruptcy Code.

. . .

Although § 523(a)(19)'s text and structure do

not resolve the dispute before us, we believe that guidance from Supreme Court, as well as our previous opinions, strongly favor the bankruptcy court's interpretation of the statute.  At the core of the Bankruptcy Code are the twin goals of ensuring an equitable distribution of the debtor's assets to his creditors and giving the debtor a "fresh start."  See *BFP v. Resolution Trust Corp.*, 511 U.S. 531, 563, 114 S.Ct. 1757, 128 L.Ed.2d 556 (1994).  Put simply, the Bankruptcy Code accomplishes this goal by including the bulk of the debtor's property in the bankruptcy estate, *see* 11 U.S.C. § 541(a), distributing that property to creditors in accordance with various provisions of the Code, and finally discharging the debtor's remaining debts unless those debts either fall into an exception or there is reason to deny a discharge altogether, *see id.* § 727(a).  Accordingly, the exceptions to discharge enumerated in § 523 necessarily prevent a debtor from receiving a completely fresh start, as the debt remains a burden even after all other debts are legally satisfied.

With this in mind, the Supreme Court has adopted a rule of construction interpreting exceptions to discharge narrowly.  *See Kawaauhau v. Geiger,* 523 U.S. 57, 62, 118 S.Ct. 974, 140 L.Ed.2d 90 (1998) ("[E]xceptions to discharge should be confined to those plainly expressed" (internal quotation marks omitted)); *Jett v. Sicroff (In re Sicroff),* 401 F.3d 1101, 1104 (9th Cir.2005); *see also* 4 COLLIER ON BANKRUPTCY ¶ 523.05 (2010) ("In determining whether a particular debt falls within one of the exceptions of § 523, the statute should be strictly construed against the objecting creditor and liberally in favor of the debtor.  Any other construction would be inconsistent with the liberal spirit that has always pervaded the entire bankruptcy system."). We also recognize that the Bankruptcy Code "limits the opportunity for a completely unencumbered new beginning to the 'honest but unfortunate debtor.' " *Grogan v. Garner,* 498 U.S. 279, 286–87, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991).  Taken together, these two basic principles suggest that exceptions to discharge should be limited to dishonest debtors seeking to abuse the bankruptcy system in order to evade the consequences of their misconduct.

1
2
3
4
5
6
7
8

>           Likewise, if we adopt the government's
> interpretation of § 523(a)(19), an innocent recipient
> of funds obtained by another party's participation in a
> securities violation can not only be ordered to
> disgorge, but must also continue paying off that debt
> even if he becomes insolvent and is forced to file for
> bankruptcy.   Although we do not dispute *Colello's*
> conclusion that a court may order recipients of these
> funds to disgorge any funds that remain in their
> possession, we do not think Congress wanted to
> immunize these debts from discharge in bankruptcy,
> when the debtor has not been found guilty of any
> wrongdoing.

9
10

Sherman, 658 F.3d at 1014-16.

11

12

Even if Strang Were Still Viable, It Must Be Strictly Limited to the Imputation of

Fraud to an Actual Partner Under Applicable Law

13

14

15

16

        In our case at hand, the BAP affirmed my determination that Ms. Schardt

was not directly liable for fraud.  Therefore, even if we were to assume, *arguendo*,

that fraud may be imputed to a partner for § 523(a)(2)(A) purposes, no such

imputation would be proper for Ms. Schardt under the facts of this case.

17

18

Facts of This Case

19

        As articulated by the BAP in its Memorandum, the facts are as follows:

20

**FACTS**

21
22
23

>         Ms. Haig and Mr. Sadler are a married couple
> who lived in Santa Fe, New Mexico.  They are active
> equestrians, own horses, and participate in horse
> shows.

24
25
26
27
28

>         Ms. Schardt is married to John Hans Shart
> ("Mr. Shart" and, together with Ms. Schardt,
> "Debtors").  Mr. Shart lives in Lynville, Tennessee;
> Ms. Schardt resides in Acton, California.  Mr. Shart is
> the 100 percent owner of Malibu Equestrian Estates,
> Inc. ("MEE").  Mr. Shart and MEE operated a horse-
> related business under the business name
> Greystone Equestrian Center ("Greystone") in

Lynville, Tennessee. The 85-acre parcel where Greystone operates is owned jointly by Mr. Shart and Ms. Schardt (the "Farm"). Ms. Schardt is an attorney with a law practice in Acton, California.

From 2002 through 2008, Creditors purchased horses from Shart or MEE. Until early 2007, all of the purchased horses were boarded at facilities in New Mexico not affiliated with Mr. Shart or MEE.

Ms. Haig and Mr. Shart developed both a business relationship and friendship from 2002 through 2008. Ms. Haig would purchase horses and rely on Mr. Shart for training advice. They met socially, with Ms. Haig occasionally staying at Greystone.

Even in the early period of their relationship, there was considerable confusion over Mr. Shart's billing for the purchase and care of Creditors' horses. On or about November 22, 2006, Ms. Haig sent Mr. Shart a letter, listing payments she had made to Mr. Hart or MEE between May 2005 and September 2006 totaling $1,849,000.00, alleging that the payments were a combination of purchases and loans, and asking Mr. Shart's help in identifying the purpose of each payment.

In February 2007, Ms. Haig and Mr. Shart attended a horse show in Gulfport, Mississippi. While at the Gulfport show, Ms. Haig agreed to have at least the majority of her horses boarded and trained at Greystone. Between March 2007 and December 2008, Creditors boarded on average twenty to twenty-five horses at Greystone.

On or about January 23, 2007, Ms. Haig allegedly purchased two motor homes, paying $245,495.00 for the first ("Motor Home 1") and $240,973.00 for the second ("Motor Home 2"). The purchases were negotiated and implemented with the dealer by Mr. Shart. Title to Motor Home 1 was placed in Ms. Haig's name, but title to Motor Home 2 was placed in Mr. Shart's name. Ms. Haig would later claim that she instructed Mr. Shart to place title to both motor homes in her name.

In 2007, Mr. Shart constructed a barn to

house some of Creditors' horses (the "Barn") and to provide living quarters for Ms. Haig during Greystone visits and to provide four suites for grooms.  It is disputed whether Mr. Shart or Ms. Haig provided the funds for the Barn's construction.  Ms. Haig also argued that Mr. Shart promised to construct the Barn as an incentive for Creditors to board the horses at Greystone.

On May 10, 2007, Jerry and Beverly Flowers recorded a deed transferring a fourteen-acre parcel adjacent to the Farm to Mr. Shart (the "Flowers Land").  Title was vested in Mr. Shart, but the parties dispute whether Debtors or Creditors provided the funds for the purchase of the Flowers Land, and whether title should have been vested in Mr. Shart or Ms. Haig.

On September 14, 2007, Ms. Haig allegedly paid $162,250.43 for the purchase of a Kenworth truck.  Mr. Shart negotiated the purchase with the dealer.  Title to the truck was placed in the name of Greystone.  In her testimony, Ms. Haig alleged that, although she authorized Mr. Shart to negotiate the purchase of the truck, she expressly instructed him to title the truck in her name.

Between 2007 and 2009, there were continuing disputes between Debtors and Creditors regarding boarding fees, documentation on invoices, and the authority of Mr. Shart to sell horses stabled by Creditors at Greystone.  In one instance, two of Creditors' horses were sold by Mr. Shart on December 18, 2008.  Ms. Haig was present and objected to the sale.  Given the parties' escalating disagreements, on January 7-9, 2009, Creditors' representatives traveled to the Farm to pick up the remaining horses.  Mr. Shart demanded payment from Creditors of alleged and disputed arrearages before releasing the horses, and eventually ordered Creditors'  representatives to leave without recovering the horses.

On February 9, 2009, Creditors sued Mr. Shart, Ms. Schardt, and MEE in state court.  Haig v. Shart, dkt. no. 4394 (Chancery Ct., Giles Cnty., Tennessee, February 9, 2009).  The complaint alleged that the defendants made multiple

misrepresentations to Creditors regarding the acquisition and sale of horses, and that there were disputed expenses for trade shows, construction costs, real estate, personal property acquisitions, and other matters related to the defendants' activities on behalf of Creditors.  Notably, the complaint focused on the actions of Mr. Shart, and only sought recovery against Ms. Schardt for "unjust enrichment."  On March 9, 2009, the Tennessee Chancery Court entered an Agreed Temporary Injunction, prohibiting Debtors from selling any additional horses or personal property owned by Creditors, including the Kenworth truck.

Creditors' representatives returned to the Farm on March 5, 2009, to remove the remaining horses and personal property of Creditors.  Mr. Shart permitted them to remove eleven horses and some other items of property.

By April 2009, Creditors had determined that at least five of their horses were still stabled at Greystone.  The state court entered an order granting Creditors possession of the horses, their request for injunctive relief, and authorization to inspect the Greystone premises.  The bankruptcy court would ultimately find that Creditors never recovered seven of their horses.

In November 2009, Mr. Shart sold the Kenworth truck to MHC Kenworth for $80,000.

Debtors filed a chapter 11 petition in the Central District of California on May 18, 2010.  Debtors indicated in their schedule A that they owned the Barn and the Flowers Land.   Schedule F listed a disputed, contingent, and unliquidated debt to Creditors for $1 million.  On September 21, 2010, the bankruptcy court converted Debtors' case to a chapter 7 case, and a trustee was appointed.

Creditors filed a proof of claim in the bankruptcy case on January 21, 2011, in the amount of $2,600,000.  Debtors objected to the claim on June 3, 2011, arguing that they did not owe the money.

Meanwhile, on August 23, 2010, Creditors

filed an adversary proceeding against Debtors.  As amended on March 9, 2011, Creditors' complaint alleged that Debtors made misrepresentations to Creditors with the intent of deceiving them into paying $1.1 million to construct the Barn and purchase the Flowers Land, among other things, and that this debt should be excepted from discharge under § 523(a)(2)(A).  The complaint further alleged that Debtors had engaged in fraud or defalcations as fiduciaries related to the $1.1 million, and that the debt should be excepted from discharge under § 523(a)(4).  Finally, the complaint asserted that Debtors willfully, maliciously, and intentionally injured the Creditors and converted their property and the resulting debt should be excepted from discharge under § 523(a)(6).  In an answer filed on April 6, 2011, Debtors generally disputed these allegations.

On December 29, 2011, the bankruptcy court approved the parties' Joint Pretrial Order both setting forth undisputed facts (which are incorporated in this factual discussion), and outlining the disputed issues of fact and law.

Over several months, the bankruptcy court conducted a five-day consolidated trial concerning Debtors' objection to Creditors' claim, and Creditors § 523(a) complaint, which concluded on July 25, 2012.  In addition to the documentary evidence submitted by the parties, the bankruptcy court heard testimony from numerous witnesses, including Ms. Haig, Mr. Sadler, Mr. Shart and Ms. Schardt.

After listening to the parties' closing arguments, the bankruptcy court orally announced its decision.  In part, the court stated that Mr. Shart's "credibility, quite frankly, is zero as far as I'm concerned. . . .  It was clear to me that he will say and did say at any time in this case what he wanted to."  Trial Tr. 101:14-23, July 25, 2012.  The court then concluded that it agreed with all arguments made by Creditors that Mr. Shart had intentionally made false statements to Haig.  Trial Tr. 102:1-2. The court examined each component of Creditor's claim, ruling which components would be allowed, which would be excepted from discharge, and which would not.

As to Creditors' § 523(a) claims against Ms. Schardt, the bankruptcy court concluded that she had not been actively involved in the fraudulent behavior and representations of Mr. Shart: "Other than let's say at the end helping with e-mails and things, I don't think she had anything to do with the actual transactions which are the basis for the claims as well as nondischargeability." Trial Tr. 100:21-25. Having concluded that she had nothing to do with the false representations or fraudulent activity of Mr. Shart, the bankruptcy court determined that Creditors' claims against her would not be excepted from discharge. In particular, as to Creditors' arguments that Ms. Schardt could be held liable because a spouse's fraud can be imputed to the other spouse under principles of agency and partnership, the court ruled "I don't think there's any imputation[.]" Trial Tr. 100:3-4. The court provided no explanation and made no findings to support that ruling, except to question the correctness of the Panel's decision in Tsurukawa v. Nikon Precision, Inc. (In re Tsurukawa), 287 B.R. 515 (9th Cir. BAP 2002) (Tsurukawa II).

On September 13, 2012, the bankruptcy court entered a judgment in favor of Creditors and against Mr. Shart for $860,726.43 as a debt excepted from discharge under § 523; although the judgment did not specify which subsection of that statute applied. The judgment also declared that Creditors' claims against Ms. Schardt were discharged.

Creditors filed a timely appeal on September 27, 2012, challenging only that part of the Judgment holding that their claims against Ms. Schardt were not excepted from discharge.

BAP Memorandum at 2:11 – 8:22.

Although I stated that "the BAP got it wrong" and that I would not follow its decision in In re Tsurukawa, 287 B.R. 515 (9th Cir. BAP 2002) (Tsurukawa II), the BAP noted "this Panel is bound to follow and enforce its own published decisions in subsequent appeals. In re Sierra Pac. Broadcasters, 185 B.R. 575, 577, n. 7 (9th Cir.

1    BAP 1995).” Id. at 13:15 – 13:19.

2

3    Even Under Tsurukawa II, It Would Not Be Proper to Impute Mr. Shart's Fraud to His

4    Wife Elke Gordon-Schardt

5          The BAP's Memorandum spelled out its holding in Tsurukawa II:

6                The teachings of Tsurukawa II can be summarized in
               three principles:
7

8                First, marriage alone is not sufficient to impute fraud
               from one spouse to another.  A business partnership
9              between a debtor and spouse for denial of discharge
               purposes exists where “the debtor assumed an active role in
10             the [spouse's business] that goes beyond merely holding a
               community property interest in [the spouse's] business and
11             performing minor services in that business.”  Tsurukawa II,
               287 B.R. at 521.
12

13               Second, “fraud may be imputed to a spouse under
               agency/partnership principles in a § 523(a)(2)(A) action.”  Id.
14             at 525.  Whether an agency or partnership sufficient to justify
               imputation of fraud to a spouse exists is a question to fact to
15             be decided under state law.  California law applies in this
               case.  A California partnership is "an association of two or
16             more persons to carry on as co-owners a business for profit."
               Cal. Corp. Code § 16101(7) (2013).  Whether parties have
17             entered into a partnership relationship, rather than some
               other form of relationship, is a question of fact “to be
18             determined by the trier of fact from the evidence and
               inferences to be drawn therefrom” and depends on whether
19             they intended to share in the profits, losses and the
               management and control of the enterprise. See Bank of Cal.
20             v. Connolly, 36 Cal. App. 3d 350, 364 (Cal. Ct. App. 1973);
               Nelson v. Abraham, 177 P.2d 931, 933 (Cal. 1947).
21             Property co-ownership of any sort, as well as profit-sharing,
               are factors which tend to establish partnership.  But see
22             Holmes v. Lerner, 88 Cal. Rptr. 2d 130, 138 (Cal. Ct. App.
               1999) (holding that sharing of profits is one evidence of
23             partnership, but not a required element).
24
25                Each partner is an agent of the partnership for the
               purpose of its business.  Cal. Corp. Code 16301(a) (2013).
26             Each partner acts as principal for himself or herself and as
               agent for the copartners in the transaction of partnership
27             business.  Tufts v. Mann, 2 P.2d 500, 503 (Cal. 1931).  In
28

-19-

1
2
3
4

      addition, "a general partner's liability is the same as that of a
principal for the fraud of his agent while acting within the
scope of his authority." Pearson v. Norton, 230 Cal. App. 2d
1, 14-15 (Cal. Ct. App. 1964) (finding partner-wife liable for
partner-husband's  fraud in sale of partnership property).

5
6
7
8

      Third, it is not necessary to prove "any knowledge on
the 'innocent' debtor's part of the fraudulent conduct" for
imputed liability purposes.  Id. at 525.  Of course, if the
debtor participated directly in the spouse's fraud, that could
be grounds for finding direct liability rather than imputed
liability.  Id. at 527.

9

BAP Memorandum at 17:4 – 18:20.

10

      The BAP then referenced eight instances in which the evidence might be sufficient to

11

impute the actions of Mr. Shart to Ms. Schardt as follows:

12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

      In this case, evidence was presented which the
bankruptcy court could review in determining the existence
of an agency or partnership between Debtors sufficient to
impute liability for the fraudulent actions of Mr. Shart to Ms.
Schardt.  For example, the evidence showed that: (1) Ms.
Schardt may have prepared and mailed allegedly fraudulent
accounting statements to Ms. Haig (testimony of John
Sharp, an assistant to Ms. Haig and former vice
president/general manager with Hilton International);
(2) Ms. Schardt may have maintained one bank account and
check register for Mr. Shart's business and assisted in
preparation of tax returns (testimony of Ms. Schardt); (3) Ms.
Schardt may have made handwritten notes on billing
disputes with Creditors and forwarded them to Mr. Shart
(testimony of Ms. Schardt); (4) Ms. Schardt may have
reviewed and edited Mr. Shart's responses to the billing
disputes (testimony of Ms. Schardt); (5) Ms. Schardt may
have directed her bookkeeper to ignore Ms. Haig's
complaints about her bills (testimony of Ms. Schardt); (6) Ms.
Schardt may have provided advice to Mr. Shart in his
negotiations with Ms. Haig (deposition of Ms. Haig);
(7) Ms. Schardt may have prepared some of the bills sent to
Ms. Haig (deposition of John Sharp); (8) Ms. Schardt signed
letters on Greystone letterhead relating to Greystone
business matters.

27

BAP Memorandum at 18:21 – 19:15.

28

I will address all eight instances that the BAP referenced above:

1.    <u>Ms. Schardt may have prepared and mailed the fraudulent accountings at</u> <u>issue in this case</u>: It is true that Ms. Schardt mailed a package to defendant, but it has not been proven to me what part, if any, she had in preparation of the accountings. Further, any involvement she had occurred in 2009, which was approximately two years after the fraud took place in 2007.

2.    <u>Ms. Schardt may have maintained one bank account and check register of</u> <u>Mr. Shart's business and assisted in preparation of tax returns</u>: Apparently, prior to 2005, Ms. Schardt and her assistant entered some information in a check register for Malibu, but it is not clear at all the extent of the information. Further, this has no effect of establishing her as a partner. Her involvement was merely through a joint bank account they opened prior to Mr. Shart moving to Tennessee. She used this account to withdraw money and make wire funds to Mr. Shart when he was in Germany. This is simply evidence of a married couple and does not in any way give rise to a partnership. Similarly, she merely acted as a messenger to occasionally bring documents to Mr. Shart's accountant, who was located in California.

3.    <u>Ms. Schardt may have made handwritten notes on billing disputes with</u> <u>creditors and forwarded them to Mr. Shart</u>: As defendant points out, there is no evidence that Ms. Schardt forwarded any handwritten notes. Further, the timing of this alleged involvement was approximately two years after the fraud had been committed. Ms. Schardt simply acted as a spouse who happened to be an attorney and helped out her husband.

4.    <u>Ms. Schardt may have reviewed and edited Mr. Shart's responses to the</u> <u>billing disputes</u>: I am not satisfied that Ms. Schardt did anything more than she claims to have done, *i.e.*, having helped her husband by correcting the grammar and wording of his letters.

5.    <u>Ms. Schardt may have directed her bookkeeper to ignore Ms. Haig's</u> <u>complaints about her bill</u>: All the evidence shows is that Ms. Schardt gave the

bookkeeper some practical advice on how she runs her business.  She advised her husband's bookkeeper not to change any of the billing simply because a client disputes it.  Further, this alleged involvement was in 2009, approximately two years after the fraud had been committed.  There is no evidence that she acted as a partner by advising the bookkeeper about her billing policies.

6.   <u>Ms. Schardt may have provided advice to Mr. Shart in his negotiations with Ms. Haig</u>:  There is no evidence that shows Ms. Schardt provided her husband with advice.  Again, even if she did, it would have been long after the fraud had been committed and in a capacity as a spouse, who was also an attorney, trying to help her husband, not as a partner.

7.   <u>Ms. Schardt may have prepared some of the bills sent to Ms. Haig</u>:  There is simply no evidence that proves that Ms. Schardt prepared some of the bills.

8.   <u>Ms. Schardt signed letters on Greystone letterhead relating to Greystone's business matters</u>:  All the evidence shows is that in 2009, much after the fraud had been committed and litigation started, Ms. Schardt sent out a copy of the complaint.  Further, the fact that the letter may have been hate-filled is irrelevant to the issue of her being a partner.  The facts do not support the conclusion that Ms. Schardt was a partner with her husband in the business.

In summary, it is undisputed that the fraudulent acts carried out by Mr. Shart did not involve Ms. Schardt.  Ms. Schardt's limited involvement only began on February 9, 2009, after the lawsuit in Tennessee began.  The fraudulent misrepresentation that Mr. Shart committed had occurred in 2007, approximately two years earlier.  Clearly, Ms. Schardt was not directly liable for fraud and was not a partner or agent with her husband in his business.


<u>Ms. Schardt's Level of Involvement Does Not Rise to the Level of Mrs. Tsurukawa in Tsurukawa II</u>

The BAP remanded this case back to me to make findings as I have done

-22-

1  above.  Even if we were to accept the BAP's opinion in <u>Tsurukawa II</u> that "fraud may be

2  imputed to a spouse under agency/partnership principles in a §523(a)(2)(A) action", our

3  case is starkly distinguishable from <u>Tsurukawa II</u>.

4       The court in <u>Tsurukawa II</u> found that the wife's involvement in her husband's

5  business was extensive and on a steady continuous basis.  The court pointed to the

6  following factors, among others, that evidence a "business partner".  First, in the

7  creation of the business the debtor went together with her husband to apply for a

8  business license.  Second, the debtor opened a bank account for the company and

9  designated herself as the sole signatory.  Third, the debtor made an initial contribution

10  to the business from her bank account.  Fourth, the debtor wrote hundreds of checks

11  and regularly balanced the account.  Fifth, the debtor represented herself as the sole

12  owner of the business on tax returns.

13       Conversely, in our case, Ms. Schardt's involvement in the business, as stated

14  above, was minimal and limited to her capacity as a wife, who was also an attorney.

15  The business was established by Mr. Shart alone, and he was the sole owner of the

16  business.  Ms. Schardt was not involved in the day to day operations and did not even

17  live in Tennessee where the ranch was located.  The fact that Ms. Schardt may have

18  reviewed notes and letters sent to creditor and advised Mr. Shart with regard to the

19  dispute is not indicative of a "business partner."

20       Plaintiffs mistakenly point to the fact "that unlike the wife in Tsurukawa, who was

21  simply a homemaker and mother, Mrs. Schardt … was an aggressive and well-

22  educated practicing attorney who performed substantial activities for the business."

23  Plaintiff's argument is not supported by the facts.  The key test according to the BAP in

24  <u>Tsurukawa II</u> is facts that show a level of involvement that justifies a determination that

25  the spouses were "business partners."  In <u>Tsurukawa II</u>, the debtor/wife had participated

26  in numerous business activities that demonstrate a business partner (see above).

27  Conversely, Ms. Schardt's participation was limited to assisting her husband,

28  approximately two years after her husband's fraud, in the very limited manner in her

1  capacity as an attorney-wife and not as a business partner.

2

3  CONCLUSION

4          I conclude that due to the development of the law regarding exceptions to discharge,

5  both statutory and decisions of the Supreme Court, that Strang v. Bradner, is no longer good

6  law and therefore the fraud of John Shart may not be imputed to his wife, Elke Gordon-

7  Schardt under § 523(a)(2)(A).

8          Nevertheless, to the extent that Strang is still viable, it should be strictly limited to its

9  facts.  Finally, even under Tsurukawa II, the facts do not support the imputation of Mr. Shart's

10 fraud to his wife.

11         The facts of this case highlight how inappropriate it is to impute the fraud of one person

12 to another under § 523(a)(2)(A).  Having to sift through numerous facts under partnership

13 principles, unrelated to any actual fraud by the debtor is a very slippery slope, and is clearly

14 not what Congress had in mind when it enacted § 523(a)(2)(A).

15         In this case, the facts are that the involvement of Ms. Schardt with the affairs of Mr.

16 Shart took place approximately two years after Mr. Shart's fraud.  Even if the debtor magically

17 became the partner of her husband in 2009, she was clearly not his partner when the fraud

18 occurred in 2007.  I am unaware of any law which imposes under partnership principles

19 liability on a person, prior to that person becoming a partner.

20

21

22

23

24

25     Date: January 29, 2014

26                                                             Barry Russell
                                                             United States Bankruptcy Judge
27

28

# NOTICE OF ENTERED ORDER AND SERVICE LIST

Notice is given by the court that a judgment or order entitled (*specify*): MEMORANDUM OF DECISION
DETERMINING THAT IMPUTATION OF FRAUD COMMITTED BY DEBTOR/HUSBAND TO
DEBTOR/SPOUSE IS UNWARRANTED UNDER SECTION 523(a)(2)(A)
was entered on the date indicated as ΑEntered@ on the first page of this judgment or order and will be
served in the manner stated below:

**1.    SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)** Β Pursuant to controlling
General Orders and LBRs, the foregoing document was served on the following persons by the court via
NEF and hyperlink to the judgment or order. As of 1/29/2014, the following persons are currently on the
Electronic Mail Notice List for this bankruptcy case or adversary proceeding to receive NEF transmission
at the email addresses stated below.


Jesse S Finlayson    jfinlayson@fwtrl.com, wmills@fwtrl.com
United States Trustee (LA)    ustpregion16.la.ecf@usdoj.gov
Jason Wallach    jwallach@gladstonemichel.com



☐    Service  information  continued  on  attached
page

**2.    SERVED BY THE COURT VIA UNITED STATES MAIL:** A copy of this notice and a true copy of this
judgment or order was sent by United States mail, first class, postage prepaid, to the following persons
and/or entities at the addresses indicated below:


Elke Gordon-Schardt
Law Office of Elke Gordon Schardt
44319 Lowtree Ave
Lancaster, CA 93534

 John Shart
c/o Kimberly Carpenter
790 Blooming Grove Road
Pulaski, TN 38478

Patricia R. Young
PERRONE & YOUNG
109 Westpark Drive Ste 330
Brentwood TN 37027

T. Larry Edmondson
Law Offices of T. Larry Edmondson
800 Broadway Third Floor
Nashville TN 37203

---

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*                                    **F 9021-1.1.NOTICE.ENTERED.ORDER**

☐    Service information continued on attached
page

**3.    <u>TO BE SERVED BY THE LODGING PARTY</u>:** Within 72 hours after receipt of a copy of this judgment
or order which bears an ⱥEntered@ stamp, the party lodging the judgment or order will serve a complete
copy bearing an ⱥEntered@ stamp by United States mail, overnight mail, facsimile transmission or email
and file a proof of service of the entered order on the following persons and/or entities at the addresses,
facsimile transmission numbers, and/or email addresses stated below:

☐    Service information continued on attached
page

---

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*                                **F 9021-1.1.NOTICE.ENTERED.ORDER**